CHAPMAN *et al.* v. KANSAS CITY, CLINTON AND SPRING-FIELD RAILWAY COMPANY, *Appellant.*

146   481
165   304
165   305
165   311
f 165   455
165   460
90a   515

146     481
101a  4555
102a  4  27

Division One, December 8, 1898.

1.  **Practice**: LETTERS AS EVIDENCE: INFERENCES: QUESTION FOR JURY. Where letters, exchanged between the parties, are offered as containing evidence of certain facts from which different inferences may be drawn, it is for the jury, and not the court, to say what is the proper inference.

2.  ——: ——: ——: ——: ABANDONMENT OF CONTRACT. Where the inference may be properly drawn from certain letters exchanged between the parties, that one of them was thereby stopped and prevented from carrying out his contract with the other, it is not the duty of the court to pass upon the effect of the correspondence, but the question should be submitted to the jury.

3.  **Contract**: NOTICE TO QUIT: DAMAGES. Where a party engaged in the performance of a contract is notified by the other to proceed no further, the party so notified is justified in quitting the work and suing for damages for breach of contract.

4.  **Appellate Practice**: FORMER APPEAL: RES ADJUDICATA. The ruling made on a former appeal is the law of the case when it comes before this court again for review, and all matters passed upon in the former decision will be deemed *res adjudicata,* and no longer open to dispute.

5. **Res Adjudicata:** CONTRACT: EXTRANEOUS MATTERS. Where on a former appeal it was decided that the opinion of defendant's tie inspectors was the only competent evidence as to the quality of the ties furnished by plaintiff to defendant railroad, it is not proper on a re-trial to permit the defendant to show that the ties furnished were not an "average" lot, did not "attract purchasers" and "many of them were culls," unless the inspectors were by the contract of purchase given the authority and exercised it of rejecting the ties on those accounts. Any testimony offered on the theory that it was competent for defendant to show the quality of the ties in some other manner than the method which the former appeal in the case said was the rule for ascertaining their quality, was properly excluded.

6. **Contract:** INTERPRETATION: INSTRUCTION: MEASURE OF DAMAGES. By contract the parties agreed that plaintiffs should deliver on defendant's right of way not less than one hundred thousand ties in the year 1887, that the minimum ties furnished per month should be ten thousand, and that of this minimum number not over twenty-five per cent should have a seven-inch face, the balance to be eight-inch ties. On July 6, plaintiffs were stopped from furnishing more ties, and sued for damages for breach of contract, stating their damage to be whatever profit they might have made on all the ties they might have furnished for the balance of the year. *Held,* that it was not error to instruct the jury that "of the 10,000 ties required to be delivered on defendant's right of way each month, three fourths of such number were to be eight-inch ties, and the jury will not find against plaintiffs on the ground that of all of the ties delivered each month there was in fact a *greater number than one fourth seven-inch ties,*" this instruction clearly meaning that the jury could not find against plaintiffs simply because of all the ties placed on the right of way each month there were more seven-inch ties than defendant was required to take under the contract. *Held,* that under this contract defendant had the right to reject all seven-inch ties in excess of twenty-five per cent of the entire number accepted. *Held,* also, that the measure of damages was the difference between the contract price and the cost of getting out and delivering the ties on defendant's right of way.

7. ———: BREACH: RELEASE OF DAMAGES. Where a cause has once accrued for damages for a breach of a contract, it can not be destroyed except by actual release.

*Appeal from Barton Circuit Court.*—HON. D. P. STRATTON, Judge.

AFFIRMED.

*Wallace Pratt* and *Goode & Cravens* for appellant.

(1) The court erred in leaving it to the jury to say whether defendant stopped and prevented the performance of the contract. Plaintiffs both testified they quit solely on account of the correspondence, beginning with the letter of July 6. It was for the court and not for the jury to say whether the effect of this correspondence was to stop them and prevent them from doing more. *Enterprise Soap Works v. Sayers*, 55 Mo. App. 15; *Falls' Wire Mfg. Co. v. Broderick*, 12 Mo. App. 378; *Luckhart v. Ogden*, 30 Cal. 547; *Van Valkenburg v. Rogers*, 18 Mich. 180; *Lea v. Henry*, 56 Iowa, 662; *Russell v. Arthur*, 17 S. C. 477; *Raney v. Higby*, 5 Wis. 62; 1 Thompson on Trials, sec. 1072; *James & Sons v. Marion*, 69 Mo. App. 207. (2) It is a question of law and should be decided by the court and not by the jury, what acts amount to an abandonment or renunciation of a contract by a party. *Henry v. Bassett*, 75 Mo. 89; *Dula v. Cowles*, 75 Am. Dec. 463; *Bufkin v. Baird*, 73 N. C. 283; *Thornoyburgh v. Mostin*, 93 N. C. 262. (3) The court below misconstrued the contract which does not mean, as is declared in the second instruction, given at the request of the plaintiffs, that if plaintiffs furnished each month as many as ten thousand ties, consisting of one fourth seven-inch and three fourths eight-inch, then any excess of ties furnished during the month might contain more than twenty-five per cent of seven-inch. *Chapman v. Railroad*, 114 Mo. 542. Where there is doubt about the meaning of an agreement the courts will adopt as correct the one adopted by the parties themselves. *Railroad v. Railroad*, 131 Mo. 291; *Ridge v. Transfer Co.*, 56 Mo. App. 133; *Strauss Saddlery Co. v. Kingman*, 42 Mo. App. 208; *Storage Co. v. Street*,

54 Ill. App. 569; *Kinney v. Comm. of Hamilton Co.*, 50 Ohio Cir. Ct. R. 433; *White v. Amsden*, 30 Atl. Rep. 972; *Webster v. Clark*, 34 Fla. 637; *Lyon v. Motley*, 30 N. Y. S. 218. The circumstances attending the making of a contract will be considered to ascertain the meaning of it. *Hanna v. South St. Joseph Land Co.*, 126 Mo. 1; *Knapp v. Publishers George Knapp & Co.*, 127 Mo. 53; *Brannock v. Elmore*, 114 Mo. 55; *Union Depot Co. v. Railroad*, 113 Mo. 213; *Fox v. Mission Free School*, 120 Mo. 349. (4) Plaintiffs had failed to perform in two respects; the proportion of seven-inch face to eight-inch was running over twenty-five per cent and the ties were of unusually poor quality, unsalable, with an extraordinary percentage of culls and were driving buyers off the defendant's line of road and injuring its freight traffic. *King Phillip Mills v. Slater*, 12 R. I. 82; *Moore v. Campbell*, 12 N. E. Rep. 495; *Roy v. Hooge*, 13 Pac. Rep.599; *Spalding v. Rosa*, 71 N. Y. 40; 3 Am. and Eng. Ency. of Law, 914; *Chapman v. Railroad*, 114 Mo. 542. (5) The letters and telegrams dated November 14 and November 16, 1887, are a complete defense to any claim for damages by plaintiffs after that date and demonstrate the error of the court in refusing the sixth instruction requested by the defendant. They also establish the fact that the plaintiffs quit work, not on account of any compulsion by the defendant; but because they were not satisfied with the inspections, for they say: *"There is no misunderstanding, there are not five specification ties to the hundred in the State, and you and every other tie man knows it."* 1 Beach on Contracts, sec. 415; *Ripley v. McClure*, 4 Exch. 344. (6) The contract of plaintiffs of January 10, 1888, by which they agreed to settle with defendant for ties as inspected by John I. Blair with the proof that Blair took all the specification ties that plaintiffs had on the right of way pursuant to that contract, is a

complete bar to plaintiffs' action in this case.   If they have any right of action it is on that contract and not the original one.   *Kimmerle v. Hoss*, 53 Mich. 431; *Goodrich v. Stoneley*, 24 Conn. 613; *Pulliam v. Taylor*, 50 Miss. 251; *Billings v. Vanderbeck*, 23 Barb. 546; *Whitney v. Cook*, 53 Barb. 551.   (7) The damages for future profits are remote and speculative and not such as can be recovered.   *Wilson v. Weil*, 67 Mo. 399; *Connoble v. Clark*, 38 Mo. App. 476; *Calloway Mining Co. v. Clark*, 32 Mo. 305; *Taylor v. Maguire*, 12 Mo. 313.

*George L. Mann, Mann & Talbutt* and *Thurman & Wray* for respondents.

(1) When written correspondence is offered in evidence to prove a fact, it is always to be interpreted by a jury. *Prim v. Haren*, 27 Mo. 205; *Wilson v. Board of Education*, 63 Mo. 137; *McNichol v. Express Co.*, 12 Mo. App. 401; *Halpin v. Manny*, 57 Mo. App. 59; *Kelly v. Rowane*, 33 Mo. App. 440; *Kingsland v. Mfg. Co.*, 29 Mo. App. 526.   When the facts are either disputed or different inferences may be fairly drawn from undisputed facts, the question should be submitted to a jury. *Huhn v. Railroad*, 92 Mo. 450; *Manerman v. Siemerts*, 71 Mo. 101; *Nagel v. Railroad*, 75 Mo. 653.   (2) This is not a question of the abandonment of the contract by one of the parties thereto, but whether plaintiffs were prevented from performing on their part by the acts of defendant.   But even where the question is one of abandonment or rescission the later authorities seem to be to the effect that it is a question for the jury. *Chouteau v. Iron Works*, 94 Mo. 388; *Seligman v. Rogers*, 113 Mo. 642; *Bass v. Jacobs*, 63 Mo. App. 393; *Mantz v. McHinnie*, 52 Mo. App. 136; *Prim v. Haren*, 27 Mo. 305.   (3) It is the well settled law of this

country as well as England that where a party is engaged in the performance of his contract and he is notified by the other party to the contract to proceed no further, he is justified in quitting and suing for a breach of the contract. *Black River Lumber Co. v. Warner*, 93 Mo. 389; *Gabriel v. The Brick Co.*, 58 Mo. App. 520; *Halpin v. Manny*, 57 Mo. 29; *Little v. Mercer*, 9 Mo. 218; *Bean v. Miller*, 69 Mo. 384; *Park v. Kitchen*, 1 Mo. App. 358; *Dobbins v. Edmonds*, 18 Mo. App. 307; *Canda v. Wick*, 100 N. Y. 127; *Hinckley v. Steel Co.*, 121 U. S. 246. After the notice to quit getting out ties July 6, 1887, plaintiffs had no right to continue to do so. Plaintiffs had a right to expect that defendants preferred to pay the damages for its breach of the contract and had elected so to do. *Hosmer v. Wilson*, 7 Mich. 293; *Clark v. Marsiglia*, 1 Denio, 317; *Derby v. Johnson*, 21 Vt. 21; *Lord v. Thomas*, 64 N. Y. 109. (4) Instruction number 2 given by the court correctly construes the contract. That instruction told the jury that plaintiffs must deliver 10,000 ties per month and that seventy-five per cent of them must be eight-inch ties and twenty-five per cent seven-inch ties. That of all the specification ties put on the road defendant was not required to take more than twenty-five per cent seven-inch face, but that it could not find against plaintiffs simply because of all the ties placed on the right of way by them there were more seven-inch ties than defendant could be required to take under the contract. The trial court's construction of this contract is not only supported by the plain meaning of the language of the contract, but in addition is supported by the construction put upon it by the parties themselves, as shown by their acts. (5) There was no "arrangement" made to "attract" tie buyers to its (defendant's) line. (6) The contention that the letters of November 14

and 16, 1887, show conclusively that defendant was anxious to get ties of good quality from plaintiffs—that plaintiffs knew it, is not supported by the record. (7) The contract with plaintiffs by which they were to settle with defendant for all ties which John I. Blair accepted on the basis of his (Blair's) inspection, has nothing to do with defendant's liability for violating its contract by preventing plaintiffs from carrying out their contract. It nowhere appears that plaintiffs agreed to release defendant from its liability by reason of such contract. There was not even an "offer" to prove any such fact. (8) It is now the settled law of this case that the inspection is conclusive against both parties until set aside for fraud. *Howard Co. v. Baker*, 119 Mo. 397; *Williams v. Railroad*, 112 Mo. 463. (9) The criticism of defendant's counsel on the first instruction referring especially to the measure of damages is extremely technical and wholly without merit. The ties could not have been inspected if they had not been gotten out; and when gotten out according to the contract the law presumes that defendant's inspectors would have accepted them. The defendant having prevented plaintiffs from getting out the ties, an inspection was not necessary to entitle plaintiffs to recover. *Black River Lumber Co. v. Warner*, 93 Mo. 383. (10) The damages resulting from the loss of profits on a contract where the party performing is prevented from completing the performance by the other party are not remote or speculative, and the measure of damages is the difference between the contract price and the cost of getting out and delivering the ties on defendant's right of way. *Black River Lumber Co. v. Warner*, 93 Mo.383; *Lewis v. Atlas Ins. Co.*, 61 Mo. 534; *Kansas City Hotel Co. v. Sauer*, 65 Mo. 289; *Park v. Kitchen*, 1 Mo. App. 356; *West v. Moser*, 49 Mo. App. 213; 1 Sedg. on Damages 473–4 and note *a.*; *Hinckby v. Pitts-*

*burgh B. S. Co.*, 121 U. S. 246; *People v. Stephens*, 71 N. Y. 558.

ROBINSON, J.—This case was here on a former appeal by defendant, when it was reversed and remanded for a new trial; the opinion on the first appeal is reported in 114 Mo. 542. Another trial was had before a jury, resulting in a verdict of $5,000 for the plaintiff. After an ineffectual motion for a new trial, defendant again appealed to this court.

This controversy arose out of an alleged breach of a tie contract. In January, 1886, the defendant made a contract with William Chapman to receive two hundred thousand seven and eight-inch specification ties at thirty-five and forty cents respectively, on its right of way, known as the Clinton branch, running from Olathe, Kansas, to Ash Grove, Missouri, the ties to be subject to inspection by any inspector the defendant might send, and to contain not more than twenty-five per cent seven-inch ties. Chapman was given the exclusive right to furnish ties on the defendant's line for the period of one year thereafter, and in consideration therefor was to deliver not less than fifteen thousand specification ties per month. In November following, and after Chapman had failed to fulfill his contract, and when eighty-three thousand ties remained to be delivered under the contract, the defendant by a supplemental agreement, extended the original contract until fulfilled, providing, however, not less than ten thousand ties a month were delivered. The latter agreement further provided that if the first contract, as thereby modified was satisfactorily carried out, the plaintiff would be given the exclusive privilege of getting out ties on the same territory for and during the year of 1887 at the rate of not less than ten thousand per month, not more than twenty-five per cent of which

should be seven-inch face, at the original contract price. The plaintiff, Harrison, was a party to the last contract, the business being carried under the firm name and style of Chapman & Harrison.

The amended petition, upon which the second trial was had, alleged performance of the contract on the part of the plaintiffs, and assigned as breaches:

*First.* That on July 6, 1887, they were prevented by the defendant from getting out any more ties under the contract after that date; that they could have gotten out and delivered on defendant's right of way, one hundred and eighty thousand ties, which would have given them a profit of five cents on each tie and that they were entitled to recover the profits which they could have made by continuing to furnish ties throughout the year.

*Second.* That the defendant failed and refused to inspect and receive certain ties which plaintiff had placed on the right of way at the time they quit getting out ties, whereby they were damaged by shrinking failure to inspect, and loss of ties burned and carried off from right of way.

The circuit court having held that there could be no recovery as to the second assignment, it is unnecessary to notice that branch of the case.

The answer admits the execution of the contract, but denies that plaintiffs performed the same on their part; admits advising the plaintiffs not to get out any more ties if they expected defendant to take them; but avers that under the circumstances they had a right so to do; denies, however, that plaintiffs were stopped or prevented from getting out any more ties under the contract; and sets up as a modification of the contract, an alleged agreement on the part of plaintiffs to accept the inspection of J. I. Blair, as the basis of settlement with defendant for all ties delivered thereunder.

The plaintiff replied by a general denial.

The defendant assigns for error on the present appeal the action of the circuit court in giving erroneous instructions for plaintiff and the refusal of proper declarations of law offered on behalf of defendant; the admission of illegal testimony for plaintiffs and the exclusion of testimony as to the poor and unsalable quality of the ties furnished by plaintiffs, and as to the large percentage of culls among them, and that they tended to drive purchasers off the road, and other similar testimony offered by the defendant.

The plaintiffs claim that they were stopped and prevented by defendant's tie agent, Mr. Jacques, from getting out any more ties under their contract after the sixth of July, 1887. The evidence relied upon to establish this fact arises wholly upon certain correspondence between Jacques and the plaintiffs.

On April 25, 1887, Jacques wrote plaintiff: "From the way things look now, I am going to have hard work to dispose of the ties gotten out on the Clinton road and this is to give you due notice that any ties gotten out must be on your own responsibility. In the course of four or five weeks, I shall have my entire contract filled, and after that, where the business is coming from, I do not know. If you see fit to get out the ties and hold them subject to my sales, well and good, but we can not agree to take your product unless we sell."

In reply thereto, the plaintiffs wrote Jacques on the next day after the receipt thereof, stating that it would be a great disappointment to them if they had to close out business on the Clinton road; that they could not close without another inspection which might be given them on the first of June; that in the meantime they would either write or see him in person, and

if the outlook was still discouraging he could advise them accordingly.

Jacques in reply, under date April 28, suggested in substance that the letter of April 25, was merely for the purpose of warning the plaintiffs of what might happen so they might get themselves in shape, and that it would be necessary to get their inspection up so as to be prepared for a more rigid inspection in the future. On April 30, plaintiffs wrote Jacques saying, that a good many culls had been put upon the road in hopes that defendant might be able to use them as culls and not as specification ties, and requested him to take the same as soon as he possibly could, promising to do better in the future. Then followed a correspondence during the month of June in which Jacques wrote urging improvement and stating that plaintiffs might look for a more rigid examination thereafter.

On July 6, Jacques again wrote the plaintiffs stating: "I am of the firm opinion that you had better get out no more ties on the Clinton road. I find it is getting to be hard work even to dispose of those you have out as the parties are not satisfied with the ties that come from this line. The sale of this material is slow, if of the best material at this time, and this is to give you due notice not to get out any more, that is if you wish us to take them."

When this letter was written the defendant had failed for nearly three months to inspect ties then on the road. On July 8, the plaintiffs replied to this letter stating in effect that it would be a great disappointment to have to close down business, but that if the defendant would take all the ties on the Clinton road they thought an arrangement could be made whereby defendant could be relieved of any further obligation under the contract. In this connection it will be observed that no reply was ever made to this letter.

It is not deemed necessary to set out or otherwise refer to the subsequent correspondence between the plaintiffs and Mr. Jacques as that relates almost entirely to the disposition of ties gotten out prior to the letter of July 6.

Plaintiffs both testified in substance that they quit getting out ties immediately on receipt of the letter of July 6, wholly on account of that letter. The circuit court refused to construe this letter in connection with the other correspondence between the parties and determine whether or not plaintiffs were prevented thereby from carrying out their contract, but submitted the question to the jury to say whether the defendant stopped plaintiff from getting out ties or otherwise performing their contract after July 6. It is insisted by counsel for defendant that if the plaintiffs did quit work it was a voluntary quitting on their part and not from any compulsion by defendant, and that it was the duty of the court to pass on that question instead of submitting it to the jury.

The rule is well settled in this State that where letters are merely adduced as containing evidence of certain facts from which different inferences may be drawn, it is for the jury and not the court to draw such inferences. *Bass v. Jacobs*, 63 Mo. App. 393; *Primm v. Haren*, 27 Mo. 205.

Counsel for defendant, in their able brief and argument, concede that the correspondence bearing upon that question might perhaps be susceptible of different views:

· *First*, that the letter was merely intended as a remonstrance against the quality of ties the plaintiffs were furnishing, coupled with a notification that unless they brought the quality up to the requirement of the contract, they must quit work, as the company would not receive a poor grade of ties any longer.

*Second*, that on account of the poor quality of the ties and the difficulty in getting purchasers to go out on the road the prospect of increasing rigor in the inspection so that plaintiffs' output of ties would not pass, they were merely requested to quit supplying ties and acceded to such request.

This view of the correspondence disposes of defendant's main argument that it was the duty of the circuit court to have passed on the effect of the correspondence instead of submitting the question to the jury. Looking then at the letter of July 6, when read and considered in connection with the other correspondence between the parties bearing upon the question, we are inclined to think that the circuit court committed no error in leaving it to the jury to say whether the plaintiffs were thereby stopped and prevented from getting out ties under their contract in July, 1887. A careful examination of the entire correspondence can lead to no other conclusion, and where, as here, there is sufficient evidence to sustain the findings of the jury this court will not interfere.

The letter of July 6, taken in connection with the other correspondence, and the circumstances under which it was written, amply warranted the jury in finding that the defendant stopped and prevented the plaintiffs from getting out any more ties under their contract. Indeed, it is not perceived how the jury could have arrived at any other conclusion. In this letter it is emphatically stated that the plaintiffs need not get out any more ties under their contract if they expected the defendant to take them. After the receipt of this letter plaintiffs had the undoubted right to stop the work of getting out ties and proceed against defendant for a breach of the contract. It has been repeatedly held that where a party engaged in the performance of his contract, is notified by the other party

to proceed no further, the party so notified is fully justified in quitting the work and suing for damages for breach of contract. *Black River Lumber Co. v. Warner*, 93 Mo. 374; *Gabriel v. Brick Co.*, 57 Mo. App. 520; *Hosmer v. Wilson*, 7 Mich. 294; *Clark v. Marsiglia*, 1 Denio, 317.

The authorities cited by counsel for defendant in their brief upon this point are not in conflict with the views here expressed.

Complaint is also made of the action of the circuit court in excluding the testimony offered by defendant as to the poor quality and general bad condition of the ties furnished by plaintiffs. The plaintiffs, however, insist that the decision of the inspectors was the only competent evidence as to the quality of the ties, and seek to sustain the action of the trial court in excluding the testimony so offered by invoking the rules laid down in the opinion on the former appeal. In the opinion written by Judge BLACK, this court held that the decision of the inspectors sent out by defendant, was final and conclusive on both parties as to whether the ties were in accordance with the contract; and that the matter of the quality of ties furnished under the contract was left to the determination of the inspectors.

It follows, therefore, that the question whether or not the ties met with the requirements of the contract, was a matter to be determined by the inspection of the inspectors sent out by the defendant. This court has uniformly held that the rulings made on a former appeal is the law of the case when it comes before the court again on a second appeal; and that all matters passed upon in the former decision will be deemed *res adjudicata* and no longer open for dispute. *Overall Admr. v. Ellis et al.*, 38 Mo. 209, and numerous cases therein cited.

While counsel for defendant, it is true, does not question the former ruling, he argues that the doctrine of the opinion is without application here. This position is clearly untenable. The judgment on the first trial was reversed and cause remanded for a new trial for the purpose of enabling the plaintiffs to present that branch of the case and upon which plaintiffs finally recovered in the court below. Indeed, this was the only assigned breach of the contract remaining after the decision upon which to remand the case for a new trial. Since then another trial has been had upon substantially the same testimony as at the first; we are of the opinion, therefore, that the trial court committed no error in excluding the testimony offered as to the poor quality of ties plaintiffs were getting out. In this connection it is strenuously insisted that defendant ought to have been permitted to show that the ties furnished defendant by plaintiffs were not an "average" lot of ties, and did not "attract purchasers," and that there were a great many culls. As we have already seen, the contract prescribed the quality of the ties to be furnished by plaintiffs, hence, it became immaterial as to whether or not the ties were an average lot. Besides, the decision of the inspectors, as was ruled in the former opinion, would be final and conclusive on that question. There is not a word or sentence in this record so far as we have been able to discover, after a careful reading, which supports defendant's contention that at the time of making the contract in question it was understood and agreed that defendant's right of way should be left so as to "attract tie purchasers." The contract is suggestively silent on that point. All that is said relative to defendant's object in making the contract is contained in the letter of July 19, where it is stated in effect that defendant would run off all the ties just as soon as it possibly could, in order to get freight

for the Clinton road. This, however, was after Mr. Jacques had notified plaintiff not to get out any more ties, and only had reference to the taking of ties already gotten out. As to the number of culls, the evidence shows that of the one hundred thousand ties gotten out by plaintiffs between the twenty-third day of April and the sixth day of July upwards of eighty-eight thousand were seven and eight-inch specification ties, one fourth of which were seven-inch face, thereby leaving about twelve thousand ties commonly called culls on defendant's right of way between Clinton and Ash Grove. The defendant was under no obligations whatever, so far as the contract was concerned, to accept the culls, and could have prevented defendant from putting same on its right of way if it had desired to do so. Accordingly the circuit court committed no error in excluding this and similar testimony.

The action of the court in excluding the testimony offered by the defendant as to the character of the inspection made by its inspectors, Cain, Camp and Beebe, when they were stopped by plaintiffs in November, 1887, is also complained of. It seems that plaintiffs, in response to questions propounded to them on cross-examination, stated that the November inspection was stopped by them; and by way of explanation, were permitted by the court to testify why they stopped it. We do not see how the admission of this testimony, or the exclusion of the testimony offered by defendant, as to the fairness of the November inspection, could result in any prejudice to the defendant. All controversy in respect to the character of the November inspection had been adjusted between the parties so that this matter had nothing whatever to do with the case, and was wholly foreign to any issue made by the pleadings. Moreover, the record shows that defendant afterwards sent out other inspectors,

inspected, and took all the ties then on its line, amounting in the aggregate to over seventy thousand. It comes with very poor grace indeed for defendant to say that the ties were not in conformity with the contract after they had been inspected and accepted by its own inspector, besides the excluded testimony comes within the scope of the former opinion that the only competent evidence as to the ties furnished, in the absence of fraud or collusion, consists of the decision of the defendant's inspectors. The excluded testimony having been offered on the theory that it was competent for defendant to show the quality of the ties in some other manner, was properly excluded.

The defendant endeavored to prove by R. D. Blair that after he purchased seventy thousand ties from defendant, both Blair and his inspector went over defendant's line in the territory occupied by plaintiffs, and only succeeded in getting thirty-two thousand specification ties, and in this connection it was also sought to show the quality of the ties so inspected and accepted.

The agreement by which defendant was to settle with plaintiffs for ties taken under the Blair inspection, was made on the tenth of January, 1888, and is as follows: "We, Chapman and Harrison, agree to settle with the Kansas City, Clinton & Springfield Railway Company for the ties as inspected by John I. Blair, or his agent, whatever he takes as eight-inch ties to be the basis of settlement with us."

The inspection which determined the quality of ties inspected by Blair, so far as plaintiff and defendant are concerned, took place after that time. The court also excluded the testimony of this witness as to the quality of ties, how many he was able to get and whether they were salable. This agreement only obligated plaintiffs to accept the inspection made by Blair

and settle with defendant on that basis. The inspection under such agreement was unquestionably binding upon both parties. It, therefore, became wholly immaterial what kind of ties Blair accepted or rejected. This assignment of error will, therefore, be ruled against defendant.

Some objections are made to the rulings of the circuit court in sustaining objections made to questions asked of some of the witnesses by counsel for defendant in course of the trial below. But after a careful examination of these objections and the arguments of counsel in relation thereto, we are satisfied that no reversible error was committed in this regard by the trial court.

This brings us to the consideration of the instructions given on behalf of plaintiffs, as well as those asked by defendant and refused by the court.

At the instance of plaintiff the court instructed the jury as follows:

"1. The jury are instructed that by the terms of the contract sued on, the defendant was required to receive railroad cross ties from the plaintiffs during the year 1887, upon conditions that the plaintiffs should complete the contract of Wm. Chapman to deliver to the defendant two hundred thousand ties, seven and eight-inch specifications, not more that twenty-five per cent to be seven-inch ties, by delivering to the defendant not less than ten thousand such ties per month from the twenty-third day of November, 1886, until said Wm. Chapman's contract was filled, all the ties to be subject to inspection by an inspector the defendant might see fit to send, and upon the further condition, that plaintiffs after the completion of the Wm. Chapman contract should continue to deliver to defendant on its right of way, not less than one hundred thousand first class ties per month during the year 1887. That

the ties defendant was required to receive were to be seven and eight-inch specification ties, not more than twenty-five per cent of them to be seven-inch ties, and all of said ties to be subject to inspection by any inspector the defendant might see fit to send, and to be paid for at the rate of forty cents each for eight-inch ties, and thirty-five cents each for seven-inch ties.

"The plaintiffs allege and claim damages for the following breach of said contract:

"That the defendant on or about the sixth day of July, 1887, notified plaintiffs not to get out any more ties, and refused to permit plaintiffs to deliver any more ties or to receive and pay for the same.

"You are therefore instructed that if you believe from the evidence plaintiffs performed their part of said contract up to the sixth day of July, 1887, and were then in the performance of the said contract, and were ready, willing and able to continue the performance of the same, then the defendant had no right to rescind such contract or prevent the plaintiffs from performing their part thereof for the remainder of the year 1887, and if the jury find from the evidence that the defendant on or about the sixth day of July, 1887, while the plaintiffs were performing their part of said contract, and were ready, willing and able to continue the performance of the same, did stop and prevent the plaintiffs from performing their part of said contract, then the plaintiffs are entitled to recover as for breach of said contract on the part of defendant, and you will assess the damage, if any, to the plaintiffs at the difference between the contract price of each tie and the cost to plaintiffs of getting out and delivering such ties on defendant's right of way, as to all ties if any which the jury may believe from the evidence plaintiffs could have gotten out and delivered on defendant's right of way in compliance with said contract from the sixth

day of July, 1887, to the end of the year, not to exceed the amount claimed in the petition which is $9,000 with six per cent interest thereon from the expiration of said contract until the present time.

"2. The court instructs the jury that under the contract defendant was not bound to take more than one fourth of the ties delivered, seven-inch ties, but if the jury shall find that in performing the contract plaintiffs delivered three fourths of the number of ties required to fill such contract eight-inch specification ties, and the balance seven-inch ties, and that of the ten thousand ties required to be delivered on defendant's right of way each month, three fourths of such number were eight-inch specification ties, the jury will not find against plaintiffs on the ground that of all the ties delivered each month there was in fact a greater number than one fourth seven-inch specification ties.

"3. The court instructs the jury that the decision of the inspectors sent by defendant to inspect the ties delivered by plaintiffs was binding on both parties to the contract as to the quality of the ties and in determining the number of seven and eight-inch ties delivered by plaintiffs you will be governed by the number of ties received by such inspectors.

"4. The jury are instructed that in determining the number of seven and eight-inch specification ties furnished by plaintiffs a month, they will be governed by the inspection made by defendant's inspectors and those inspecting by authority of defendants."

The court refused to give the following instructions asked by the defendant:

"1. Under the evidence in this case the plaintiffs are entitled to recover, and you will find the issues for the defendant.

"2. The construction and legal effect of the correspondence between plaintiffs and defendant with

regard to the cessation by plaintiffs of putting out ties under the contract for 1887, is that. both the plaintiffs and defendant consented to plaintiffs' ceasing to put out ties thereunder after July 6th, 1887, and not that the defendant compelled plaintiffs against their will to discontinue furnishing ties."

"3.  You are instructed that the evidence in this case does not show that the defendant stopped the plaintiffs from getting out ties in July, 1887, and you will find the issue for the defendant.

"4.  The only evidence that the defendant stopped the plaintiffs from putting out ties in July, 1887, as is charged by the plaintiffs, is contained in the correspondence introduced by the plaintiffs between them and Jacques, which correspondence must be all construed together, and when so construed is insufficient to warrant a finding that the defendant did compel the plaintiffs, against their will, to discontinue the putting out of ties or the further performance of their contract.

"5.  To comply with the contract for furnishing ties for the year 1887, it was necessary not only that the minimum delivery of 10,000 a month should contain a greater proportion of seven-inch specification ties than 25 per cent, but also that any excess. of specification ties over and above such minimum delivery of 10,000 a month, delivered by the plaintiffs should contain no greater proportion of seven-inch specification ties than 25 per cent.

"6.  In no event are the plaintiffs entitled to recover for profits on ties which they might have gotten out after November 14th, 1887, but did not get out.

"7.  The court instructs the jury that if they believe from the evidence, that of the ties delivered on defendant's right of way, after the 200,000 ties called for by the contract for the year 1886 had been filled, a larger portion than 25 per cent were seven-inch

specification ties, then and in that event you will find the issues for the defendant, although you may believe from the evidence that defendant stopped plaintiffs from getting out ties in July, 1887.

"8.   Unless the jury believe from the evidence that the ties which the plaintiffs could and would have gotten out and put on defendant's right of way between the 6th day of July and the 31st day of December, 1887, would have passed inspection in the proportion of not less than 75 eight-inch for every 25 seven-inch specification ties they will find the issues for the defendant.

"9.   Under the contract sued on defendant was not bound to accept from plaintiffs a greater proportion of seven-inch specification ties than 25 per cent, and there being no evidence tending to prove that only 25 per cent of the ties, which plaintiffs claim they could have furnished after July 6th, 1887, would have passed inspection as seven-inch specification ties, and the remainder eight-inch, the damage claimed by plaintiffs on account of the alleged stopping of the work by defendant are speculative, and you will find the issues for the defendant.

"10.   The defendant sets up in its answer that the chief inducement to the contract sued upon was that it might have manufactured along its line a superior quality of ties good and salable for its freight business and thereby attract attention of purchasers, of which inducement plaintiffs knew and further pleads that the greater portion of ties were of an inferior grade, many of them worthless, piled upon its right of way, and that dealers in consequence thereof were not attracted to defendant's line of road by the good quality of ties, but refused to go upon its road on account of such great number of worthless ties piled along its track. Therefore, if you believe from the evidence that an

unreasonable number of ties so piled along said rail-
road track were not of the good quality required by
the contract, but were worthless, calculated to deter
purchasers from going upon defendant's line to ex-
amine and buy ties, you will find the issues for defend-
ant.

"11. If you believe from the evidence that on July
8th, 1887, Chapman & Harrison proposed to defendant
to relieve defendant of any obligation to take ties from
said Chapman & Harrison on the Clinton road there-
after, and further believe from the evidence that there-
after on January 8th, 1888, the plaintiffs, Chapman &
Harrison agreed to settle with the defendant company
for ties as inspected by J. I. Blair or his agent and that
whatever ties said Blair or his agent should take as
8 inch ties, should be the basis of such settlement, and
further believe from the evidence that thereafter pur-
suant to said agreement the defendant made a sale of
70,000 ties to said Blair, also that the agent said Blair
inspected the ties of plaintiffs and took their ties to
fill said purchase of 70,000 as far as they would pass
inspection, then and in that event this matter of con-
troversy between plaintiff and defendant was settled
and adjusted, and you will find the issues for the
defendant.

"12. If you find from the evidence that the ties
delivered on defendant's right of way by plaintiffs
after the 200,000 contract of Wm. Chapman assigned
to plaintiffs had been filled were not seven and eight-
inch specification ties and in the proportion of not
more than twenty-five per cent thereof seven-inch ties,
up to July 6th, 1887, then the defendant had the right
to stop plaintiffs from putting on further ties, and you
will find the issues for the defendant.

"13. If you find from the evidence that when
plaintiffs received the letter of July 6th, 1887, notify-

ing them not to get out any more ties on that territory if they expected defendant to take them, the plaintiffs made no remonstrance, but on July 18th thereafter, wrote defendant's agent Jacques that they would act on his advice, then, and in that event, you will find the issues for the defendant.

"14.    If you believe from the evidence that the ties which plaintiffs had gotten out under the 1887 contract prior to July 6th, of that year, at which time plaintiffs claim they were stopped from putting out ties by defendant, were not reasonably good ties but were of such inferior grade as to deter purchasers from buying ties on the Clinton road, then and in that event you will find the issues for the defendant; although you may believe from the evidence that defendant on said July 6th did stop plaintiffs from putting out ties.

"15.    The original contract with Wm. Chapman of January 26, 1886, and the modification thereof on the 30th of November, 1886, read in evidence by the plaintiffs are to be taken and construed together as one contract.    And under the correct interpretation and construction thereof the plaintiffs, to entitle them to the right to continue getting and delivering ties to defendant on its right of way, were required to furnish ties for defendant's inspection in the proportion running not less than 75 eight-inch to every 25 of seven-inch specification ties.    And it appearing from plaintiff's own evidence, as well as that of the defendant, that of the several inspections had of the ties gotten out prior to July 6th in the year 1887, but one inspection showed the proportion above named, the defendant had the right on said last named date to put an end to the further getting out of ties by plaintiffs under said contract."

At the outset it might be observed that this question involves the construction of the contract sued on.

Plaintiffs contend that the delivery of a small number of seven-inch ties in excess of twenty-five per cent did not constitute a breach of the contract so as to entitle defendant to stop plaintiffs from getting out ties. On the other hand counsel for defendant adroitly argues that of all the ties which plaintiffs might deliver, not more than one fourth thereof must be seven-inch face. By reference to the contract it will be seen that the parties fixed a minimum number of ties to be gotten out by plaintiffs at the rate of ten thousand per month; after having so fixed the minimum, the contract provides that not more than twenty-five per cent of that number shall be seven-inch face. We are of the opinion the plaintiff's second instruction correctly construed the contract. This instruction told the jury in effect that plaintiffs must deliver ten thousand ties per month and that seventy-five per cent of them must be eight-inch, and twenty-five per cent seven-inch ties, and that of all the ties placed on the right of way defendant was not required to take more than twenty-five per cent seven-inch face, but that they could not find against plaintiffs merely because of all the ties placed on the right of way by plaintiffs there were more seven-inch ties than defendant was required to take under the contract.

The clause of the contract which provided that the ties were to be subject to inspection by any inspector defendant might see fit to send shows that it was contemplated by the parties that there would be ties furnished which would not conform to the contract, and the defendant has carefully safe-guarded against taking such ties. No provision of the contract obligates defendant to take any culls whatever; nevertheless, at every inspection made by defendant's own inspectors culls were found among the ties furnished by plaintiffs. Yet this was not treated as a breach of the contract;

besides the correspondence between the parties clearly shows that it was well understood that there would be a certain per cent of culls at each inspection. A cull was a tie that did not conform to the specifications, that is, which was less than either a seven or eight-inch face.

Under the date of February 9, 1897, Mr. Jacques wrote the plaintiffs among other things, saying: "The ties which we are inspecting are nowhere up to the quality they have been, and there are too many culls. If this continues, we must refuse to take culls in the quantities you are furnishing them now."

On the following day plaintiffs wrote Jacques in reply, saying: "The large number of culls come from the fact that only one car of culls was taken at the last two inspections, and from the large number of ties on this road to cull from."

On March 3, Jacques again wrote plaintiffs, stating in substance: "We now have your ties on the Clinton road taken up, and it is now time to talk about further business. We shall not take anywhere near the quantity of culled ties on future shipments; five per cent being the most we will agree to take."

Thus conclusively showing that it was understood all along that there would be culls from each inspection, and that while defendant was willing to accept them as culls, yet it desired plaintiffs to curtail the output of such ties in future deliveries. Giving then to the words of the contract the meaning which all the surrounding circumstances show to be the obvious one, it will be seen that plaintiffs were only required to furnish ten thousand ties per month, seventy-five per cent of which must be eight-inch and twenty-five per cent seven-inch ties, and to observe such proportions in their monthly outputs throughout the continuance of their contract. It can not be said that plaintiffs were not in compliance

with their contract if in fulfilling it they put on defendant's right of way more than twenty-five per cent of seven-inch ties to inspect from, in furnishing the specification ties required by the contract. In other words while defendant was under no contract obligation to take more than twenty-five per cent seven-inch ties to seventy-five per cent eight-inch ties, and in this proportion through its monthly delivery, if, however, the ties ran to a greater proportion than twenty-five per cent seven-inch ties, defendant's inspectors had the undoubted right, which they were not at all backward in exercising, to reject any excess of such ties. And this seems to be the interpretation placed upon the contract by the parties themselves, as shown by their acts.

The correctness of plaintiff's first instruction, more particularly that portion thereof relating to the measure of damages, is challenged by defendant. This instruction in construing the contract told the jury in substance that defendant was not required to take more than twenty-five per cent seven-inch ties, that all ties so furnished were subject to inspection by defendant's inspectors, and limited plaintiff's recovery to their profit on all ties, if any, which the jury might believe from the evidence plaintiffs could have gotten out and delivered on defendant's right of way, in compliance with the contract, from July 6 to the end of the year.

The evidence tends to show that if plaintiffs had not been stopped from getting out ties they could have gotten out and delivered on defendant's right of way, between the sixth day of July and the termination of their contract, from one hundred and eighty thousand to two hundred thousand ties, the average profit on which would amount to four and one half cents on each tie. There is no merit in defendant's criticism on this instruction. Manifestly the ties could not have been inspected if they had not been gotten out, and if gotten

out in conformity with the contract, the law presumes that they would have been accepted by defendant's inspectors. Besides the defendant having prevented plaintiffs from getting out the ties, an inspection was not necessary to entitle plaintiffs to recover. Under the authorities, the court was warranted in instructing the jury that plaintiff's measure of damages was the difference between the contract price and the cost of getting out and delivering the ties on defendant's right of way. *Black River Lumber Co. v. Warner*, 93 Mo. 382; *Masterton v. Mayor of Brooklyn*, 42 Am. Dec. 38.

Defendant further argues that the matters here in controversy were settled by contract of January 10, 1888, and that if plaintiffs have any right of action it is on the latter contract and not on the original one, and consequently the circuit court erred in refusing defendant's eleventh instruction, based on that theory. This position of counsel we conceive to be untenable. There is no controversy whatever concerning the material facts out of which this contract originated. In December, 1887, Mr. Jacques wrote plaintiffs that he had sold the ties then on the Clinton road to John I. Blair, subject to his inspection. And thereupon plaintiffs executed the agreement in question, which is set forth in full in another part of this opinion. It is not perceived how this agreement can possibly operate as a settlement of defendant's liability for violating its contract by refusing to take plaintiffs' ties after July 6, 1887. The only matter covered by the agreement is the settlement for ties accepted by Blair in his inspection, all of which were delivered prior to the time when plaintiffs were stopped from getting out ties. Moreover this contract does not purport to release defendant for its liability for damages on account of the original contract. *McKnight v. Dunlop*, 5 N. Y. 544, held that where a cause

has once accrued it can not be destroyed except by actual release.

The instructions given for the plaintiffs under the circumstances disclosed by this record, when taken together, fully and fairly presented for the consideration of the jury every conceivable phase of the case. It follows, thereof, that the court committed no error in refusing the instructions asked by defendant. There being no reversible error in the record, the judgment is affirmed. All concur.