MASSMAN CONSTRUCTION COMPANY, A CORPORATION, RESPONDENT, v. LAKE LOTAWANA ASSOCIATION, INC., A CORPORATION, APPELLANT.— 210 S. W. 2d 398.

Kansas City Court of Appeals.   Opinion delivered February 9, 1948.

470

*Warren S. Earhart* and *Jeter & Earhart* for appellant.

*Roy W. Crimm* for respondent.

BLAND, J.—This is an action for the balance claimed to be due under an excavation contract. There was a verdict and judgment in favor of plaintiff in the sum of $8521.56, and in favor of defendant in the sum of $700 on its counterclaim based upon plaintiff's delay in performing the work. Defendant appealed to the Supreme Court and that court transferred the cause here.

The facts show that on July 14, 1944 the parties hereto entered into a written contract in which plaintiff undertook to make certain improvements to the spillway in the dam at Lake Lotawana in Jackson County, consisting of the construction of a sluiceway approximately 7 feet deep, 13 feet wide and 400 feet long, whereby the water level of the lake could be lowered 7 feet to enable repairs to be made at the top of the dam which impounds the water making the lake. The work consisted of breaking the concrete floor of the existing spillway for the length and width of the sluiceway, excavating the material found thereunder for the required depth, length and width, concreting the sides and bottom of the excavation and installing a gate to control the flow of water. It also involved the excavation of an approach channel between the lake and the entrance to said concrete sluiceway.

The contract provided: "EXCAVATION: Borings along the spillway indicate that the excavation will be in material classified as shale. Bidders should satisfy themselves as to the class of material which will be encountered and its method of removal. It is believed that the rock will not be found but a unit price is requested for rock excavation for use in calculating payments if rock is found. * * *

"ROCK EXCAVATION: It is believed that no rock excavation will be encountered but if material is required to be removed which meets this description, it will be classed and paid for as rock excavation:

"Rock shall be interpreted to include all solid rock ledge formation which can be removed properly only by means of explosives, barring or wedging, or by some other recognized method for quarrying solid rock. It shall also include boulders of one-half cubic yard or more in volume."

The contract also provided that plaintiff should furnish the tools, labor, material and machinery necessary to do the work required at the following prices: "Excavation and grading for sluiceway, including removal of any and all materials encountered except solid rock per cubic yard One Dollar $1.00. * * * For rock excavation in

either sluiceway or approach channel, per cubic yard Eight Dollars $8.00''. It also provided: '' 'Consulting Engineer' or 'Engineer' shall mean Charles A. Haskins, the Consulting Engineer for Lake Lotawana Association. 'Resident Engineer' shall mean the Resident Engineer for Lake Lotawana Association, acting personally or through assistants duly authorized by the Consulting Engineer'' It further provided that it shall be the duty of the engineers to see that the contract is carried out in accordance with the plans, specifications and contract provisions, ''inspect materials and workmanship, interpret plans and specifications, make such measurements as will determine payments to the contractor, and generally represent the Association on the work''.

The contract further provided: ''PAYMENT: Not later than the 15th day of each calendar month, the Association will make partial payment to the Contractor on the basis of a duly certified approved estimate of the work performed during the preceding calendar month by the Contractor, but the Association will retain 10 percent of the amount of each such estimate until the final completion and acceptance of all work covered by this contract. * * * FINAL ESTIMATE: The Engineer shall, as soon as possible after the completion of the work under this contract, make a final estimate of the amount of work done and the Association shall, within thirty (30) days (subject to its approval and acceptance) after such final estimate is made, pay the entire sum as found to be due, after deducting therefrom all previous payments. All prior estimates and payments shall be subject to correction in the final estimate and payment''.

F. M. Dozier was the resident engineer on the job during the performance of the work. He made two preliminary measurements and estimates under the supervision of Charles A. Haskins, engineer, assisted by George F. James, plaintiff's superintendent, and $12,883.26 was paid by defendant to plaintiff on these estimates. This amount was 90% of the contract value of the work done up to that time. On April 14, 1945, a final estimate was made by Dozier, assisted by Henry Daley, representing the plaintiff, under the supervision of Haskins, which showed a balance due plaintiff of $2474.68. Plaintiff refused to accept payment on this estimate. All of the estimates were based on a charge of only $1.00 per cubic yard for the 787.3 yards of excavation in controversy, the estimate showing that no rock excavating was done. The controversy between the parties is over whether this 787.3 cubic yards of the excavation done is to be classified as rock excavation to be paid for at the rate of $8.00 per cubic yard instead of $1.00 per cubic yard, for which plaintiff would be paid under the estimates.

Over the objection of defendant plaintiff was permitted to show that the 787.3 cubic yards in controversy was rock excavation. According to the contract and plans the depth of the excavation varied according to the ground elevation, the bottom and sides of which were to be

474

brought to an exact grade and alignment by trimming and shaping so that the same could be lined with concrete. Hence it was required that the "lines must be held straight and in true alignment." Plaintiff would not be paid for any material excavated outside of the lines and, if it did so, would be required to fill the same at its own expense.

On account of the excavation of the sluiceway being only 13.2 feet in width it was impossible to use a power shovel with a larger than a 3/8 cubic yard bucket on account of the fact that any larger shovel would be equipped with a boom that would come in contact with the sides of the excavation as the shovel was being operated. The power shovel used was equipped with projecting teeth or prongs with sharp edges with which to dig into and lift the materials to be excavated. Very little excavating was done until (according to plaintiff's evidence) the material uncovered was such as to require drilling and blasting. A solid ledge was encountered going the full depth of the excavation. One of plaintiff's witnesses referred to this material as rock. One called it soapstone and others shale. Various witnesses testified to its laying in solid, compact ledges or ledge formation. All witnesses testified that it was blue or blue-gray in color, entirely different in color and character from the yellowish material encountered near the surface. In one or two instances where the teeth of the shovel were able to catch on to a projected material the shovel raised, not material the width of the bucket, but a part of the ledge extending far beyond the lines of the 13.2 foot trench, and destroying the side walls of the trench. If the rest of it could have been so elevated and excavated it "would have opened up a wide, ragged trench--difficult to say how wide it would be--just a big, wide, ragged hole in the ground". In all other instances the teeth or cutting edge of the power shovel could not penetrate or get into this ledge, but would slip up over the top of it.

According to plaintiff's evidence the only practical method of excavating this rock ledge was by drilling and blasting, which was done, and plaintiff claims it is entitled to payment for this work as for removal of rock under the contract. There is ample evidence on the part of plaintiff that the 787.3 cubic yards of excavation in controversy was for the removal of rock. Plaintiff's evidence tends to show that Mr. Dozier approved of the equipment used and the use of blasting methods in the excavating.

F. M. Dozier, resident engineer, testifying for defendant, stated that the character of the excavation encountered in the sluiceway was "shale and loose shale or clay, you might call it. * * *. There was yellow and gray or bluish-gray, whatever color you would name that. The yellow stratas were near the top on the lake side--we will put it that way -- and the blue or gray colors were of a harder degree and more toward the center of the spillway". Asked if any material was encountered which would be classified as rock as mentioned in the con-

tract, he answered: "I didn't see any if there was. I don't believe there was"; that he was there all of the time. He testified that it was impossible to have excavated the material in controversy except by drilling and blasting with the equipment that plaintiff used; but that plaintiff could have done the excavating without blasting by the use of a 2-yard drag line which would not have interfered with the sides of the trench. ."Q. In your opinion, would it have been possible to have excavated all the material encountered in that sluiceway with a 2-yard drag line? A. Well, I believe you could. That is just my belief"; that a 3/8 yard shovel is ordinarily used for "bank excavation or loading of material, but it probably * * * usually works in soft easily handled material"; that the shovel used by plaintiff only handled the material after it had been "shot" or "shattered" by a charge of dynamite. Asked whether the machine used was adequate to do the work, he testified: "A. Well, it seems as though it was light, but we can't recommend what a contractor uses on a job or dictate his methods. If he wants to do it that way, that was satisfactory with us. Q. Did you specify that they use dynamite to remove the shale? A. No. Q. What, if anything, did you do in connection with their using dynamite in excavating that shale? Did they ask you to consent to it? A. No; I don't think they ever asked us to consent to it. They just went ahead and excavated with it and, naturally, inasmuch as they were getting the job done, no objections were raised. * * * In your opinion, would it have been possible to have removed the material found in that spillway with other machinery or other methods, bearing in mind that those methods should be practical; by usual and customary engineering methods? A. Yes, I believe so. Q. In other words, the use of a drag line could have done it. A. Yes, using a drag line, and a bigger and heavier machine".

The evidence shows the sides of the excavation to have been irregular and jagged and that these edges were smoothed up by using the sharp end of an ax. The witness testified that this would not have been possible or practical in excavating solid rock. On cross-examination, he testified that James, when the preliminary estimates were made, agreed to the total measurements but not the classifications. As before stated, these preliminary estimates showed that no rock excavating had been done. He further testified that approximately 800 cubic yards of material removed, which is in controversy, was shale, and the only practical way of removing it was by blasting "with the equipment that the contractor had on the job". He was asked: "Q. Material that is as tough as this and as hard and brittle and compact as was encountered here, where the teeth of the shovel would not penetrate it, pulling a bucket by cable wouldn't penetrate it either, would it? A. I am inclined to believe that it would. Q. What makes you think it would? Did you ever see it done? A. Yes. I have seen them take and pull it right up. Q. Did you ever see it done in material like

this? A. Just as tough as this, yes. Q. As hard? A. Yes, sir''. He further testified that he did not object to the use of explosives on the job; that ''I didn't tell them that that would not be paid for as rock. They could have determined their own methods, as far as we were concerned. Q. You approved the methods? A. That's right. Q. You approved the machinery that they placed on the job as suitable, did you not? A. Well, there was no formal act of approval. They could use--they started the work and were to carry the contract through. We were generally not approving the equipment; there was no provision for it''.

On being re-called Dozier testified that it would have been a little difficult to excavate the material in controversy by ordinary excavating methods, ''a little tough on the machine to do it, but I think it could''; that there was no provision in the contract for earth removal.

Charles A. Haskins, testifying for defendant stated: That he wrote the specifications and prepared the contract documents, received bids and had general supervision over the construction of the work after it started until it was finished; that the decisions made as to the classification of materials were his decisions; that he saw the work being done as it progressed; that it would have been possible to have excavated the material in question by use of a drag line outside the trench; that nothing was found that ''we classified as rock''; that the material he saw was ''shale * * *. It varied a little bit. It was mostly--near the bottom it seemed to be blue shale. It was a yellowish gray near the top''. He was asked: ''Q. No question about the quantity, that there was 787.3 cubic yards of material excavated that had to be shot or was removed by the use of explosives, is there? A. There is no question about the fact that it had to be shot? Q. Yes. A. Yes, I can think there is a question that it had to be shot. Q. No question about that that was the quantity that was removed by explosives, is there? A. I didn't measure it. I depended on Mr. Dozier's measurements. Q. You did accept Mr. Dozier's measurements? A. Yes, sir. Q. You accepted Mr. Dozier's measurements throughout, didn't you? A. That's right. Q. And his reports as to the material and what the material consisted of? A. No. I saw the material. Q. You saw the material? A. Yes, Sir. Q. Did you see that steam shovel? A. Yes, sir. Q. That they had out there? That was as large a steam shovel as you could turn there, wasn't it? A. I don't know whether you could get a larger steam shovel there. It was one of the smallest steam shovels I am familiar with. I believe too small. Q. But the only one you could get in a 13-foot trench, isn't it. A. I presume it was about as large as you could work in that trench. Q. That is one customarily used in earth excavation in a limited area? A. In earth excavations, yes, in a trench. Q. For any excavation other than rock? A. No. You can work that using a large earth machine. Q. But this was not a large area? It was a restricted area? A. It all depends;

no, I wouldn't say it was. Q. You made no objection to the type and articles of equipment Massman furnished? A. No. I think I remarked to Mr. Towne that it was a very small shovel to use on that type of job, after he got into the material. Q. That was after he got into the material? A. That's right, yes. Q. You made no comment before that? A. No. Q. You didn't make any requirement that he replace it? A. We don't attempt to dictate to the contractor what equipment he uses in the project''.

Defendant insists that the court erred in refusing to sustain its motion for a directed verdict for the reason, among others, that under the terms of the contract the engineer's classifications of material and estimates of quantities excavated were conclusive on the parties. These contract provisions were pleaded by the defendant and, further, that the engineer determined the matter by his estimates, the final estimate showing a balance of $2474.68 upon the contract and that no rock excavation had been done. It is well settled that parties to a contract, such as one for excavating material, may agree that the kind and amounts of material excavated shall be ascertained and measured by an engineer, even though he is an engineer of one of the parties to the contract, and the determination of such engineer is binding upon the parties in the absence of fraud, or such gross mistake as would imply bad faith on the part of such engineer, or where the engineer misconstrued the contract, (Williams v. Chi. etc. Ry. Co., 112 Mo. 463; Hunt v. Owen Bldg. & Inv. Co., 219 S.W. 138; Stiero Bros. Constr. Co. v. Moore, 158 S.W. (2nd) 253; Universal Constr. Co. v. City of St. Louis, 223 S.W. 931; McGregor v. Constr. Co., 188 Mo. 611), and this rule applies even though the contract does not in express terms provide that the decisions of the engineer shall be final and conclusive if it is to be necessarily implied that such is to be the case. (Chapman v. The K.C. Clinton & Sp. Ry. Co., 114 Mo. 542; Chapman v. The K.C. Clinton & Sp. Ry. Co., 146 Mo. 481; Nofsinger v. Ring, 71 Mo. 149; Mackler v. R. R. 62 Mo. App. 677; Del Vondio v. Dold Packing Co., 79 Mo. App. 465, 470; Gratiot Street Warehouse Co. v. Wilkinson, 94 Mo. App. 528; Chapman v. Eneberg, 95 Mo. App. 127, 132; Rogers v. Rehard, 122 Mo. App. 44, 49, 50; Barton v. Guar. & Sur. Co., 192 Mo. App. 561, 566.) A stipulation in the contract that payment shall be made only upon the certificate of the engineer is equivalent to providing that the decisions of the engineer are conclusive. (9 Am. Juris. p. 26; 9 C. J. p. 826.) In none of its pleadings did plaintiff allege any facts tending to show that the engineer was guilty of any fraud, mistake or any misconstruction of the contract.

The contract in the case at bar provided that it shall be the duty of the engineer to make such measurements *as will determine payments to the contractor;* that the engineer shall make a final estimate of the work done and that the Association shall, after such final estimate is made, *pay the entire sum as found to be due.* The use of this language

is equivalent to a provision that the estimate of the engineer shall be binding and conclusive upon all parties.

Plaintiff in support of its contention insists that in the absence of express language in the contract making the estimates final and conclusive they do not have that effect. Among the cases cited by plaintiff are Memphis, C. & L. R. R. Co. v. Wilcox, 48 Pa. 161; Central Trust Co. v. Louisville, St. L. & T. Ry. Co., 70 Fed. 282, 284, 285 and J. E. Salfisberg & Co. v. St. Charles, 154 Ill. App. 531. These cases seem to support plaintiff's contention but they are not in harmony with the law of this state and, in fact, with the weight of authority. In support of its contention plaintiff also cites Myers, etc. v. Union Elec. L. & P. Co., 334 Mo. 622. That case involved the construction of a contract for the clearing of land. It was provided in the contract that plaintiffs were to be paid $40 per acre for the work. Plaintiffs claimed that they were entitled to have the entire acreage measured and paid for on the basis of $40 per acre, and defendant, that plaintiffs were entitled to payment only for that portion of the land mentioned in the contract where actual clearing was done. The contract provided for measurements and estimates by the engineers as the basis of settlement and payment made upon a final estimate. Plaintiffs accepted all payments on the basis shown by the estimates, including the final estimate, and the court said, l. c. 630: "When a contract provides, as this one does, for measurements and estimates by engineers as a basis for settlement, and payment is made thereunder upon a final estimate, there must be some evidence of mistake, bad faith or fraud before the determination of the matter by such engineers can be disregarded". It will thus be seen that the court held that the estimates could be impeached for mistake, bad faith or fraud. It reversed the judgment and remanded the case so that plaintiffs might impeach the accuracy of the final estimate, if they could, and show any additional amount due under the contract. The court mentioned the circumstances that the contract did not provide (in terms) that the estimates were to be conclusive and alluded to the fact that plaintiffs had accepted all payments shown by the estimates. However, none of these cases that we have cited, supra, upon the point that final estimates may be conclusive, although they are not expressly made such in the contract, was overruled. A holding that plaintiff was bound by the estimate, in a case where he accepted the money shown by it to have been due him, is not necessarily a holding that had he not accepted it he would not have been so bound. We do not think that the Myers case is any aid to plaintiff in this case.

There is no claim of fraud on the part of the engineer in this case; nor is there any proof of mistake, or that the engineer misconstrued the contract. The fact that the engineer did not classify the material in controversy as rock is no evidence that he was guilty of making a mistake such as is meant in matters of this kind, although, plaintiff's

evidence tends to show, as a matter of fact, that the material in controversy was rock. The provisions in the contract that the engineer was to make the measurements, as well as determine the payments to the contractor and, after final estimate was made, the sum found to be due by him was to be paid, shows that it was the purpose of the parties executing the contract to obviate any controversy between them as to the character of the excavated material.

Had the evidence shown as a matter of law (as plaintiff contends) that the excavated material in controversy was rock, then a different question would be presented. The engineers testified that the material was shale, not rock, and the contract on its face differentiates shale from rock. The contract recites: ''Borings along the spillway indicate that the excavation will be material classified as *shale*. \* \* \* It is believed that no rock excavation will be encountered but if material is required to be removed which meets this description, it will be classified and paid for as rock excavation.''

It is insisted that as the material in controversy could be moved only by blasting with the machinery used and the evidence shows that defendant's engineer approved the machinery, defendant should be required to pay for the excavation of the material on the basis of its consisting of rock. It is true that the contract provided that the duty was upon the engineers ''to see that the contract is executed in detail in accordance with the contract provisions;'' and it also provided that plaintiff should provide ''the necessary and most suitable tools and machinery to be used in the performance'' of the work. The engineers testified to the effect that as long as the desired result was being accomplished, they felt that they had no power to object to the machinery actually employed by plaintiff on the work. There is no evidence that the approval of the machinery went any further than this, and it is unnecessary for us to say whether they had the power, under the contract, to order other machinery to be used because the kind employed by plaintiff was such that blasting was necessary. We find nothing in the evidence to indicate any fraud on the part of the engineers, in this respect. There were several estimates made during the progress of the work and everyone of them showed that no rock excavation was being done. While all of these estimates were subject to correction in the final estimate, the preliminary estimates show that the engineers were taking the position that no rock excavation was being done. There is no evidence tending to show that plaintiff was misled, in any way, by the conduct of the engineers.

Defendant's motion for a directed verdict should have been sustained. (Hamlin v. Duke, 28 Mo. 166; Bowen v. Lazalere, 44 Mo. 383.)

The judgment in favor of plaintiff is reversed.

All concur.