PUBLIC WATER SUPPLY DISTRICT NO. 8 OF JEFFERSON COUNTY, Plaintiff-Appellant-Respondent,

v.

MARYLAND CASUALTY COMPANY, Defendant-Respondent-Appellant,

and

L. C. R. Excavating Contractors, Inc., Defendant-Respondent.

No. 55593.

Supreme Court of Missouri, Division No. 1.

March 13, 1972.

Opinion Modified on Court's Own Motion April 10, 1972.

Motion for Rehearing or to Transfer to Court En Banc Denied April 10, 1972.

———◆———

Thurman, Nixon, Smith & Howald, Jeremiah Nixon, Hillsboro, for Public Water Supply Dist. No. 8 of Jefferson County.

Joseph H. Mueller, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, for Maryland Cas. Co.

SEILER, Judge.

Contractor breached a contract with water district to install a water distribution system. Water district sued surety for the contractor for $122,949.51, the full amount of the performance bond. The surety filed a cross-claim against contractor for indemnification. A supplier sued the contractor and its surety for $17,656.79 worth of materials furnished. The claims were consolidated for trial, and the judgment awarded $17,656.79 to the supplier, and $22,041.71 to the water district. The surety and water district appeal.

On December 21, 1967, Public Water Supply District No. 8 of Jefferson County entered into a contract with L.C.R. Excavating Contractors, Inc. for the construction of a water distribution system. The contract price for the work to be performed was $122,949.51 based upon unit prices and estimated quantities of work to be done and supplies and materials to be used and installed. A performance payment bond was furnished, in the penal sum of $122,949.51, with the Maryland Casualty Company as surety.

The contractor commenced to install the pipe for this subterranean water system in March, 1968. By November, 1968, the contractor had installed about 7,000 feet of cast iron pipe and 60,000 to 65,000 feet of plastic pipe. The contractor began to test the water lines under pressure to determine if they met the contract specifications. The testing revealed that there were numerous leaks in the system. The contractor repaired a number of leaks but in spite of his efforts only a 300 foot section of cast iron pipe passed the required pressure test. In March, 1969, the contractor terminated the testing of the pipe and walked off the project.

Subsequently, the water district and Phillips Products Company, manufacturer and supplier of the plastic pipe, tested and made repairs on the lines. At the time of the trial, about 20,200 feet of water pipe had been tested. Repairs were still being made. Only the 300 feet of cast iron, and about 1,450 feet of plastic pipe passed the pressure test. The water district also completed installation of pipe in five widely scattered areas where the contractor failed to do so.

The court, as the trier of fact in this jury-waived case, found that the water district spent $14,241.78 for a contractor to test and repair some of the worst leaks, $5,800.00 for additional engineer expense to locate leaks, and $7,800.00 to complete the installation of the lines required by the contract. However, the court concluded that the additional engineer expense was not chargeable against the contractor because the engineer representing the water district agreed to waive certain preinstallation tests on the pipe. The court refused

to grant damages in the amount needed to replace the system completely with the new pipe because these damages would be remote and speculative since only 20,200 feet of pipe had been tested. The court also indicated that such damages could not be chargeable against contractor because the engineer on behalf of water district relied upon a written guarantee from the manufacturer of the plastic pipe in lieu of the required tests and the water district had filed suit elsewhere to recover damages from the manufacturer of the pipe.

■ In accordance with the Civil Rule 73.01, V.A.M.R., we review *de novo* the facts as well as the law, as in an equity case. We recognize and reiterate that ". . . the court's finding is not binding on us; that the question is not merely whether the court's findings are supported by substantial evidence; and that we are to make our independent investigation and reach our own conclusions as to the weight of the evidence . . ." Schmitt v. Pierce, (Mo.Sup. banc), 344 S.W.2d 120, 122; Cleary v. Cleary, (Mo.Sup.) 273 S.W.2d 340, 346. We need not give deference to the opportunity of the lower court to ascertain the credibility of witnesses because their testimony was not in conflict and much of the evidence was documentary, not testimonial.

J. C. Stevens & Associates, Inc., a civil engineering firm, was the engineer employed by the water district for the project. Danny Gardner, an employee of this firm, was the resident engineer responsible for seeing that the work was on schedule, measuring the work performed, observing the testing, and confirming that specifications were being carried out. The water district contends that since the engineer determined that the water distribution system was totally unacceptable, and cheaper to rebuild than repair, the surety is liable for the full amount of the bond. The surety maintains that the evidence showed the water distribution system to be opera-

tive, and thus the engineer's opinion must be rejected as speculation and conjecture. The surety also argues that the engineer acting on behalf of the water district waived certain pressure tests required by the contract specifications and that the damages of water district resulted from this waiver.

This contract entrusted many decisions to the engineer. The following provisions were specifications incorporated into the contract:

*2.3.01  Engineer's Responsibility and Authority:*

All work shall be done under the general supervision of the Engineer. The Engineer shall decide any and all questions which may arise as to quality and acceptability of materials furnished, work performed, rate of progress of work, interpretation of Drawings and Specifications and *all questions as to the acceptable fulfillment of the Contract on the part of the Contractor.* (italics added).

*2.3.02  Engineer's Decisions:*

All claims of the Owner or the Contractor shall be presented to the Engineer for decision which shall be made in writing within a reasonable time. All decisions of the Engineer shall be final except in cases where time and/or financial considerations are involved, which shall be subject to arbitration.

*2.7.17  Acceptance and Final Payment:*

When the Contractor shall have completed the work in accordance with the terms of the Contract Documents, the Engineer shall certify his acceptance to the Owner  .   .   .

■ Under the clear language of these specifications, the engineer had the authority to determine when the work had been

performed in accordance with the contract, and the responsibility to certify this determination to the water district. "A stipulation in the contract that payment shall be made upon the certificate of the engineer is equivalent to providing that the decisions of the engineer are conclusive". Massman Const. Co. v. Lake Lotawana Ass'n, Inc., 240 Mo.App. 469, 210 S.W.2d 398, 402. There is no contention here that the engineer certified his final acceptance of the work of the contractor, or that the contractor did not breach the contract. However, the surety points out that the determination by the engineer would not be binding upon the parties if a result of ". . . fraud, or such gross mistake as would imply bad faith on the part of such engineer . . ." Massman Const. Co. v. Lake Lotawana Ass'n, Inc. supra. In order to respond to this contention, we must analyze the evidence in some detail.

During November, 1968, the contractor began to subject the installed water pipe to the pressure tests required by the contract. In simple terms, the test consisted of introducing water into a sealed off section of water line, increasing the pressure, and measuring and judging whether the water line could bear the required pressure. During the first test, water was pumped from the well into a section of the line. The contractor and engineer waited in vain for the pressure to rise. They discovered the pipe was crushed at one location allowing the water to drain onto the ground. The contractor repaired the break and resumed the testing. The pressure increased in the line, then suddenly dropped, as the coupling linking two sections of pipe pulled apart. A visual examination of the water line revealed numerous lines. In retrospect, this episode was an inauspicious harbinger.

For the next five months, the contractor continued to repair, test, and repair sections of pipe selected at random. The contractor cooperated fully with the engineer in the making of these tests. Only 300 feet of cast iron pipe met the standards prescribed in the specifications. The contractor admitted that he "couldn't repair the leaks that were there". After the contractor left the job, a plumbing company repaired leaks in the pipe and tested the system. At the time of trial a total of about 20,200 feet of pipe had been tested. Of this, about 1,450 feet of plastic pipe, in addition to the 300 feet of cast iron pipe, passed the required pressure test.

Mrs. Joyce Miller, clerk of the water district, and two engineers, Mr. Stevens and Mr. Gardner, testified concerning the failure of the water system to properly perform its function. From this testimony, it can be concluded that vast amounts of water leaked from the water distribution system into the ground. The water district has endeavored to repair major leaks (those evidenced by water on the surface of the ground) as they appear. New leaks continued to appear in sections of the water lines where no leaks had previously occurred or where leaks had been repaired. The major portion of the water leakage does not result from major leaks, but from an accumulation of many small subsurface leaks. These leaks expand in time under the pressure and become major leaks. The rate of water loss was not constant, but rose or fell depending on the number of leaks in the system at a given time.

The documentary evidence supports the view of water district that dissipation of water remained at an intolerable level even after the efforts to repair the leaks in the water distribution system. The water district mechanically monitors the amount of water pumped from the well into the water storage tank and the amount of water sold to the customers. Based upon this information, the water district prepared a chart which compares the average daily pumpage with the average sales for the period March to December, 1969. During this period the daily sales rose from about 2,500 gallons to 5,000 gallons, and leveled off at

that point. The pumpage has fluctuated wildly, rising in May to 100,000 gallohs, declining to 17,000 in November, and rislng to 32,000 in December. According to the monthly business report submitted to the Farmers Home Administration for November, 1969, the water district pumped 746,200 gallons of water, but sold only 126,050 gallons. This pumpage figure is verified by reference to another exhibit, a series of print-outs from a device that measures how many times the water storage tank has been refilled.

Because of the large loss of water through these leaks, the system must be shut down from time to time. When this occurs, pressure within the system drops below that of the atmosphere, and a health hazard is created because pollutants from septic tanks and nature get into the system. The wear and tear on the water pump at the well is increased because of the additional water required by the system.

Mr. Stevens concluded in August 1969 that it would be cheaper to replace, rather than repair, the water distribution system. Mr. Gardner testified that it would be less costly to replace the system than to test the untested portion of the system. Based upon bids for similar type of work, it would cost about $220,000 to replace the system.

At the time of trial, the water district served about sixty customers from the system. It appears that between March and December, 1969 that the average amount of water pumped daily, although substantial, generally diminished. This is no doubt due to the continued efforts to repair the leaks in the system. We recognize that there is some evidence to support the position taken by the surety. However, to concur in the view of the surety, we would have to overlook the preponderance of evidence to verify the opinion of the engineer that the installed system was totally unacceptable, will continue to be so, and must be replaced.

We conclude from our examination of record that the water district met the burden of proving the unacceptability of the entire water distribution system. We note, as did the court below, that about 48,000 feet of pipe remains untested, but even so, the unworkableness of the system was evident. We believe to require the water district to perform tests on the remaining pipe would merely be an expensive exercise to verify a foregone conclusion. The system leaked because the pipe that the contractor chose to install was defective and not because of the quality of the contractor's work. According to testimony at the trial, 99% of the leaks in the plastic pipe was attributable to defective manufacture and the trial court so found. We note also, that of the 20,200 feet of pipe tested and repaired, less than 2,000 feet were found to meet specifications. The plastic pipe, tested and untested, was of the same type provided by the same manufacturer. There was no indication that only one load or one shipment of pipe had been defective. If this had been the situation, the results of the random testing would have so indicated. Under the facts of the case, it is not speculation to assume the untested pipe is also defective.

There is no serious dispute that, if the entire water system must be replaced, the cost of doing so and the damages thereby to the water district, exceed by a wide margin the full amount of the bond.

We next consider the contention of the surety that it is excused from all liability on its bond because the defects in the system were attributable to the engineer's waiving of tests required by the specifications which would have revealed the deficiencies in the system early enough to have avoided them. The factual basis of this contention is as follows:

The major portion of the defects in the system occurred in plastic pipe supplied by Phillips Products Co., Inc. The contract

called for extensive use of plastic pipe to be furnished by the contractor. The specifications required to be met were set forth in detail. The specifications required the engineer to select random pipe lengths from each shipment from which the contractor was to make up not less than three test sections comprising two lengths of pipe, one joint and two end caps. The joint was to be allowed to cure for 72 hours and thereafter the contractor was to hydrostatically test the section at a constant pressure of 320 pounds for four hours. According to the engineer and the contractor, such tests were not required or made. Both the engineer and the contractor testified that, in lieu of such tests, they relied upon the manufacturer's guarantee of the pipe which was used. As stated, according to the testimony at the trial, 99% of the leaks which were ultimately discovered in the plastic pipe were attributable to defective manufacture.

A further provision of the specifications required hydrostatic testing of the lines after they had been backfilled to one foot, with the joints left exposed. The engineer did not require this test. Testing began after the backfilling had been completed and the joints were not exposed.

On its appeal and in response to the district's appeal, surety contends that the defects in the system were attributable to the engineer's reliance upon the Phillips guarantee in lieu of requiring the tests called for by the specifications. Surety points to the terms of the general conditions under which the engineer was required to decide "all questions which may arise as to the quality and acceptability of materials furnished" as authorizing the engineer to accept the guarantee in lieu of the testing.

We cannot accept the premise of surety that waiver of the tests by the engineer relieved the contractor and thereby the surety from liability for failure to perform the contract by reason of the installation of defective materials. The contract provided: "Any defective work whether the result of poor workmanship, use of defective materials, damage through carelessness or any other cause shall be removed within ten (10) days after written notice is given by the Engineer, and the work shall be re-executed by the Contractor. . . . The Contractor shall warrant all equipment furnished and work performed by him for a period of one year from the date of written acceptance of the work." The contractor was obliged to use materials which would produce an operative system. The preliminary testing procedures were as much for his benefit as for the benefit of the owner. The foregoing of such tests was a matter of mutual understanding between the contractor and the engineer. The president of L.C.R. testified that testing began when the water was available. "It was a mutual decision [of the contractor and engineer]." He testified that the arrangements for the Phillips guarantees were made by the engineer and the contractor. "Each of us [insisted on a guarantee]. The guarantee was for me as well as for them." The contractor did not consider the postponing of the tests as any waiver of his obligation to provide nondefective materials. The contractor's president testified that, after the water was available, they tested whenever the engineer wanted them to test and made replacements as requested until March when the contractor went broke.

The contract itself provided an alternative for the hydrostatic testing after the lines had been installed. That provision contained the following: "At the Contractor's election, he may perform the tests after the trench has been backfilled." This provision of the contract authorized the method of hydrostatic testing actually employed, and fully answers any claim of waiver based upon failure to require hydrostatic testing before the trenches had been filled.

■ In summary, the contractor was well aware that it was obliged to install a system that would meet certain tests. By

mutual understanding, preliminary tests were dispensed with and other tests postponed. However, the obligation to meet the tests ultimately required continued and was recognized by the contractor. The waiver and postponement of the tests affords no basis for relieving the contractor of his obligation to provide an operable water distribution system.

The water district appealed from the judgment in its entirety; the surety appealed only as to the portion of the judgment in favor of the water district. The water district is aggrieved by judgment awarded the supplier, Sidener Supply Company ($17,656.79), because to that extent it diminishes the amount available from the surety to the water district, whose loss, we have found, exceeds the face of the bond.

 The water district contends there is no proof in the record that the materials furnished by Sidener were incorporated into the water system as required by the bond. The bond language is ". . . materials furnished in connection with said Agreement . . . consumed or used in connection with the construction of such work . . ." While the trial court found Sidener furnished the materials and that the materials were used in connection with the construction of the water system, there is no evidence to support the latter finding, and the judgment in favor of Sidener Supply Company should not have been entered. ". . . [O]nly such articles as actually went into the structure . . . so as to become a part of the same . . . consumed or destroyed in, the construction of the work . . . fall within the protection of the bond." Wiss v. Royal Indemnity Co., 219 Mo.App. 568, 282 S.W. 164, 165.

The judgment awarded Sidener Supply Company was for the full amount of its claim and no appeal was taken by it. On the contrary, the transcript shows that the Sidener judgment was satisfied in full about a month after the filing of the water district and surety appeals. No question was raised on appeal as to whether, under

the circumstances, the surety could not safely have paid the Sidener judgment. We, therefore, believe the Sidener judgment should be left undisturbed, with the surety being given credit for the same, $17,656.79.

Accordingly, the judgment of the trial court is reversed and the cause remanded with directions to enter judgment in favor of the water district and against the surety for $105,292.72, being the full amount of the bond less the amount of the Sidener Supply Company judgment, and in favor of the surety and against the contractor on the surety's cross claim in the full amount of the bond, to-wit, $122,949.51.

All of the Judges concur.