**BERNARD McMENAMY CONTRACTORS, INC., a Missouri Corporation, Plaintiff-Respondent,**

v.

**MISSOURI STATE HIGHWAY COMMISSION, Defendant-Appellant.**

No. 29687.

Missouri Court of Appeals,
Western District.

April 30, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 11, 1979.

Application to Transfer Denied
July 17, 1979.

308 ■ 

Bruce A. Ring, Richard L. Tiemeyer, Jefferson City, for defendant-appellant.

Robert L. Hyder, Hyder & McHenry, William A. Spencer, Jefferson City, for plaintiff-respondent.

Before HIGGINS, Special Judge, Presiding, PRITCHARD, J., and WELBORN, Special Judge.

ROBERT R. WELBORN, Special Judge.

Action by contractor on highway construction project to recover damages for breach of warranty of plans and for breach of contract. On a trial to the court, judgment was entered for plaintiff for an aggregate amount of $418,904.41, with interest at the rate of 6% from the date of filing of plaintiff's petition.

In August, 1969, the Missouri State Highway Commission sought bids for the construction of 7.506 miles of Interstate Route 55, in Cape Girardeau County. The low bid of $6,757,715.45 was submitted by Bernard McMenamy Contractors, Inc., and on September 25, 1969, the commission entered into a contract with McMenamy on the basis of its bid. The project was finally accepted as completed in September, 1973. McMenamy was paid $6,753,847.53 by the commission. In November, 1974, McMenamy filed a claim for adjudgment with the commission seeking additional payment under the contract and the remission of $60,-000 liquidated damages charged by the commission for failure to complete the project within agreed time. The commission rejected the claim except for the remission of $1,500 liquidated damages and McMenamy brought this action.

McMenamy's petition was in two counts. The first count was for various items, the major portion being based upon the claim that underground conditions encountered at the site differed from those represented by the commission's plans and proposals, resulting in additional costs to plaintiff. Count II of the petition alleged that the commission knew that the underground conditions were not as represented by the plans and that by reason of the failure of defendant to represent the true conditions existing in the area of the project, plaintiff had been obligated to construct a project not contemplated on submission of its bid for which plaintiff was entitled to receive $600,000.00.

At the conclusion of the trial, the court's findings, largely in favor of plaintiff, were all based upon Count I. The court, in its judgment, concluded that Count II had been abandoned and it was dismissed.

Respondent's bid and the contract based upon it were on a unit basis. Two of the items were for 1,712,948 cubic yards of "Class A" excavation at 71 cents per cubic yard and 100,357 cubic yards of "Class C" excavation at $2.60 per cubic yard.

Section 203.1.1, Missouri Standard Specifications for Highway Construction (1968), incorporated in the contract, defined Class A Excavation as "all roadway and drainage excavation not classified as Class C, Sandstone or Igneous Rock." Class C Excavation was defined as "the removal of stone in ledges six inches or more in thickness * *."

The plans for the project indicated that rock could be encountered at ten locations. The design cross-sections for rock areas indicated back slopes of ¼:1 in rock cuts, or almost vertical back slopes in such cuts.

Mr. William R. Wallace, a graduate engineer, was respondent's chief engineer. He had been employed by the appellant as an engineer from 1928 until 1940. During the war, he was employed by the Corps of Engineers and he became a Corps officer. After the war, he worked in private engineering jobs until 1955, when he was again employed by appellant. From 1962 to 1964, he was General Inspector of Construction for appellant. He resigned in 1964 to accept private employment and in 1965 he was employed by respondent as General Superintendent, a position he held until 1972. Wallace was respondent's principal witness at the trial.

According to Wallace, all of the slopes shown in rock cuts by the plans were ¼ to 1. " * * * [Y]ou go up one foot and over ¼ of a foot; in other words, almost vertical." This " * * * indicates that this rock is of a very stable ledge formation, otherwise it could not be placed on a ¼ to 1 slope, if it was sloughed very much under the weather conditions and all, if it's put in a flat slope." However, there was no cut on the project as built that was classified as 100% ledge rock, or Class "C" excavation. Instead respondent found pinnacles of rock with plastic clay crevices and formations of boulders embedded in plastic clay. There

was no place where only Class "C" excavation was encountered and all of the Class "C" was in percentage material in which, according to the specifications, the contractor and the highway commission representatives agree on the percentage of rock and earth in the material excavated. In only a few areas could vertical slopes be constructed. Most slopes were variable, "anywhere from a half to 1 up to 2 to 1 backslope."

Respondent encountered rock in 23 separate locations rather than the 10 indicated on the plans. Respondent was paid at the unit price for the excavation of 146,508 cubic yards of Class C excavation.

In August, 1968, the Soils and Geology Section of Division 6 of the highway department made a report of its Soil Survey of 13.5 miles of Route I–55 in Cape Girardeau County, including the area covered by the contract. The report stated that " * * * the subsoil throughout the project will consist of a waxy reddish to yellowish clay with a Group Index of 20 and a Plasticity Index of 40 to 50." The report further stated that limestone found to have been present was "quite broken." One formation was described as "a series of unconnected pinnacles." This report was not a part of the bid papers furnished to prospective bidders. Wallace stated that he did not know that the report of the geologist would be available if he asked to see it.

■ Although respondent's brief is in some respects couched in terms of recovery on the basis of misrepresentation, it does accept appellant's categorization of Count I of its petition below upon which the court found for respondent as "one for breach of warranty." Missouri cases have refused to find an implied warranty of sufficiency of the plans and specifications in cases involving State Highway Commission Construction contracts. *Sandy Hites Co. v. State Highway Commission*, 347 Mo. 954, 149 S.W.2d 828, 833–835[3–5] (1941); *Cameron, Joyce & Co. v. State Highway Commission*, 350 Mo. 389, 166 S.W.2d 458 (1942); *Webb-Boone Paving Co. v. State Highway Commission*, 351 Mo. 922, 173 S.W.2d 580, 584–585[6][7] (1943). Those cases point to the

requirement of an affirmative misrepresentation as essential to recovery based upon breach of warranty. In *Schmelig Construction Co. v. Missouri State Highway Commission*, 543 S.W.2d 265 (Mo.App.1976), this court refused to find a breach of implied warranty, absent affirmative misrepresentation, even though the condition there involved had been known to the highway commission and unknown to the contractor. In the case of *Denton Construction Co. v. Missouri State Highway Commission*, 454 S.W.2d 44 (Mo.1970), the court held that the furnishing by the commission to a contractor of plans for the previously constructed roadbed upon which the contractor was to lay pavement "constituted a representation by the Commission to plaintiff that the roadbed had been constructed according to those plans, or at least within the generally accepted tolerances." 454 S.W.2d 49[4].

For its first point on this appeal, appellant contends that the court "erroneously applied the law" in concluding that appellant breached an implied or express warranty in the contract. Specifically appellant contends that the trial court erred in finding that the plans indicated that the contractor would encounter 100,357 cubic yards of solid ledge rock at approximately ten locations because the contract quantities were only estimates and ¼:1 back slopes on commission cross-sections did not represent only solid ledge rock. Inasmuch as this position is stated as a subpoint of the charge that the court erroneously applied the law, it must be understood as meaning that, as a matter of law, the trial court could not have found as it did, not that under the evidence the court should have made a contrary finding. Thus, although appellant argues at length on this point on the basis of the commission's evidence, such evidence is really not for consideration in passing upon the trial court's ruling as a matter of law.

Unquestionably, respondent's claim of positive representation of ledge rock must depend upon the ¼:1 back slopes on the commission's original cross-sections as explicated by Wallace. This case does not deal with words, for which resort to a dictionary may ordinarily assist in interpreting the terms of an agreement. It deals with lines on plans, lines the significance of which would be apparent only to engineers, contractors or others familiar with highway construction plans.

Appellant asserts that "McMenamy relied and rested on the * * * bald assertions of its chief engineer, William R. Wallace." Appellant cites no authority which purports to hold that Wallace's testimony per se, was lacking in probative value. Therefore, this possibility is not required to be pursued.

■ Essentially, appellant's position is that the terms of the contract negatived any warranty regarding underground conditions on the job and therefore McMenamy's basic claim must fail.

Appellant relies upon the following provisions of the proposal, contract and specifications:

1. The fact that the contract unit price for rock was expressed in terms of Class C Excavation per cubic yard.

2. The definition of Class C in Section 203.1.2, Standard Specifications:

"Class C Excavation will consist of the removal of stone in ledges 6 inches or more in thickness. A ledge will be considered to be a continuous deposit of rock that may or may not include thin, interbedded seams of soft material or shale. The vertical limits of each ledge will be determined by beds of soft material or shale more than 12 inches thick. The beds of soft material or shale will be included in the measurement of Class A Excavation only. Boulders or other detached stones each having a volume of 2½ cubic yards or more will be considered as Class C Excavation."

3. The contract provision:

"The Contractor further agrees that he is fully informed regarding all of the conditions affecting the work to be done, and labor and materials to be furnished for the completion of this contract, and that his information was secured by personal investigation and research and not from any estimates of the Commission; and that he

will make no claim against the State or Commission by reason of estimates, tests, or representation of any officer, agent, or employees of the Commission."

4. Paragraph 4 of the Proposal:

"4. MISCELLANEOUS. The undersigned, as bidder, declares * * * that he has carefully examined the location of the proposed work, the plans, Standard Specifications, and special provisions heretofore mentioned, and the form of contract and contract bond; that he proposes, and agrees, if this proposal is accepted, to execute the contract and bond and secure execution of the bond by satisfactory surety and to provide all necessary machinery, tools, apparatus, and other means of construction, and will do all the work and furnish all the materials specified in the contract, in the manner and time therein prescribed and in accordance with the requirements of the engineer as therein set forth; and that he will accept in full payment therefor the amount or amounts certified by the engineer in accordance with the bid, specifications, and contract."

Section 102.5, Standard Specifications:

"102.5 Examination of Plans, Specifications, Special Provisions, and Site of Work. The Commission will prepare plans and specifications giving such directions as will enable the contractor to carry them out. The bidder is expected to examine carefully the site of the proposed work, the proposal, plans, specifications, supplemental specifications, special provisions, and contract forms before submitting a proposal. The conditions indicated on the plans and in the proposal represent information available from surveys and studies, but the submission of a bid shall be considered proof that the bidder has made his own examination and is satisfied as to the conditions to be encountered in performing the work and as to the requirements of the plans, specifications, supplemental specifications, special provisions, and contract."

Contractual provisions such as these were held in *Webb-Boone Paving Co.*, supra, to preclude recovery on an implied warranty that subsurface structures would not be encountered. The excavation encountered an abandoned railway trestle and the contractor was not permitted to recover resultant increased costs. In *Sager v. State Highway Commission*, 349 Mo. 341, 160 S.W.2d 757 (1942), recovery for extra expense for removal of underground stumps and roots in a borrow pit area was denied, for, among others, the reason that "it was left to the bidder to satisfy himself as to such conditions * * *." 160 S.W.2d 760. In *Schmelig*, such provisions were relied upon to preclude recovery for breach of warranty of plans and specifications for failure to indicate the presence of limestone even though the commission was aware of the limestone. These cases proceed generally on the theory expressed in *Sandy Hites*, supra, that there cannot be "an implied provision in a contract exactly opposite to and in direct conflict with a definite and specific provision therein." 149 S.W.2d 834.

In *Sandy Hites*, supra, the court distinguished cases involving " * * * specifications, upon which the contractor was entitled to rely, [which] positively misrepresented conditions unknown to the contractor." 149 S.W.2d 834. A similar distinction was made in *Cameron, Joyce & Co. v. State Highway Commission*, 350 Mo. 389, 166 S.W.2d 458, 461 (1942). In *Webb-Boone Paving Co.*, supra, the court noted: "There is no showing of any affirmative misrepresentation or fraud." 173 S.W.2d 584[6]. *Schmelig*, supra, relied upon the absence of any provision of the plans or specifications as representing affirmatively subsoil conditions which could be expected on the job. 543 S.W.2d 267.

Respondent's position is that there was such a positive representation in this case in the plans which showed ¼:1 back slopes because such back slopes could be constructed only in solid ledge rock. Giving credence to Wallace's testimony, as the trial court obviously did, this contention is tenable.

The presence of a positive representation, coupled with knowledge of the conditions on the part of the commission, distinguishes this case from those above referred to in which no breach of warranty was found.

In view of Wallace's testimony, the posture of this case is similar to that of *United States v. Atlantic Dredging Co.*, 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920). In that case, plans and specifications did describe the nature of the material required to be excavated. The item was stated in terms of "belief" and bidders were required to examine the work and decide for themselves the character of the material. Bidders were referred to maps exhibiting the results of test borings by the government. These maps confirmed the description of the material as mud and fine sand. However, the test borings had provided the government with information showing that the material was such that it would be much more difficult to remove than that made to appear. The latter information was not provided to bidders. The contractor encountered impenetrable material on the job and was held entitled to recover the difference between the amount expended by it and the contract price. The court held that a direction to contractors to visit the site and inform themselves of the actual conditions did not relieve the government from liability for defects in plans and specifications. The court held that the contractor was justified in relying upon the expression of belief by the government as to the nature of the materials.

In this case, the specifications stated that the plans were based upon "information available from surveys and studies * *." However, the plans did not, according to Wallace, correctly indicate the character of the rock to be excavated and the information available to the commission in that regard was not provided bidders.

Appellant suggests that this case is similar to *United Const. Co. v. City of St. Louis*, 334 Mo. 1006, 69 S.W.2d 639 (1934). That case involved a contract for construction of a sewer tunnel. The contract stated that borings indicated that the tunnel would be through solid limestone. However, bidders were cautioned to examine core drilling materials and the city disclaimed liability for conditions different from those shown on the plans. The core drillings were made available to bidders. Plaintiff examined them and knew that the borings disclosed other than solid limestone. The court denied recovery in view of the city's disclaimers and plaintiff's knowledge. The fact that bidders were provided with the basic information available to the contracting agency distinguishes that case from this case. The holding of that case is not here controlling.

In this case, plaintiff's evidence made a showing of positive misrepresentation on the part of the commission, thereby distinguishing this case from all prior cases in this state relied upon by the commission for denial of recovery. There has been no discrediting plaintiff's evidence as a matter of law and therefore it cannot be said that the trial court erroneously applied the law in permitting recovery under Count I of plaintiff's petition.

■ Appellant makes the further contention that the judgment erroneously applied the law because Count I of plaintiff's petition stated a cause of action in tort, for which the commission was not liable.

Appellant points to respondent's reliance upon *Clark v. City of Humansville*, 348 S.W.2d 369 (Mo.App.1961), as a case "almost identical with the case here" as demonstrating that respondent's claim was in tort for misrepresentation, for which appellant could not be held liable because of its immunity from tort liability.

The *Humansville* case discussed at length the nature of a cause of action in a case such as this and concluded that the action there involved was one to recover damages for misrepresentation and was not on the contract. 348 S.W.2d 371[3, 4]. *Humansville* involved a lump sum, rather than unit price, contract for the construction of a sewer. The case was before the court on the sufficiency of the petition which alleged that the contract documents misrepresented that 18,000 cubic yards of dirt were required to be excavated whereas in fact excavation of 36,000 cubic yards was required. In holding that the petition stated a cause of action, the court pointed out that construction of sewers was a proprietary func-

tion of the municipality involved for which it had no tort immunity. 348 S.W.2d 374–375[5].

Of course, the fact that respondent relies upon the *Humansville* case is not conclusive as to the nature of the action here stated. Count I of the respondent's petition contains no allegation of misrepresentation. If respondent's claim is supportable as one based upon breach of warranty, misplaced reliance upon *Humansville* would not defeat its claim.

Adequate answer as to the nature of this case is to be found in *United States v. Atlantic Dredging Co.*, supra. In that case, the contention was made that the claim was in tort. The court rejected the contention and held that recovery was for breach of warranty. 253 U.S. 12, 40 S.Ct. 423. That conclusion answers appellant's contention here.

Appellant complains of the trial court's exclusion of evidence which indicated that Wallace knew or should have known the nature of actual subsurface conditions on the project and that ¼:1 back slopes on the plans did not represent only solid rock.

■ This was a court-tried case. Rule 73.01 1.(a) prescribes a procedure for such cases whereby evidence ruled inadmissible may be reported in full in such case. When such procedure is followed, the evidence is before the appellate court for review of the ruling on its admissibility, and, if found admissible, for consideration upon review of the case.

■ In this case, the appellant complains of the trial court's exclusion of testimony of five of appellant's witnesses designed to show that by reason of Wallace's experiences in other situations as a highway commission employee, he knew or should have known that ¼:1 slopes on highway plans are not intended as a representation of only solid ledge rock. However, in only one instance was the procedure authorized by Rule 73.01 1.(a) followed. In the other instances, the subject was dropped when objections to questions by appellant's trial attorney were sustained. Some of the docu-

mentary and photographic exhibits which the trial court excluded have been filed as exhibits on this appeal. They have been examined and considered. Nothing contained in them would cause this court to reject the trial court's acceptance of Wallace's credibility.

In the case of witness Coy Breuer, whose experience with the commission was similar to that of Wallace, the trial court sustained an objection, based upon the best evidence rule, to a question of the witness: "Mr. Breuer, have you ever seen a set of Missouri State Highway Commission plans which require excavation in pinnacle type limestone rock that showed anything but a ¼ to 1 back slope?" Actually, the objection was sustained after the question had been answered in the negative. Here, appellant asserts the relevancy of this testimony but does not touch upon the basis of the trial court's action—the best evidence rule. This court will not pursue that problem.

The appellant relies upon the rule that the trial court's findings lose weight when it excludes competent evidence. *Weber v. Les Petite Academies*, 548 S.W.2d 847, 851[4, 5] (Mo.App.1976). However, that rule can be applied only to the extent that the excluded evidence has been properly preserved for examination by the appellate court.

In the final analysis, appellant has made no showing of error on the part of the trial court in this regard which calls for reversal of the court's judgment. *Webb v. St. Louis County National Bank*, 551 S.W.2d 869, 883–884[17, 18] (Mo.App.1977).

Appellant next contends that the trial court should have sustained its motion for judgment because respondent failed to prove that appellant's engineer misconstrued the contract or that his estimates and decisions were fraudulent or contained such gross errors as to impute bad faith on the part of the engineer.

Section 105.1.1, Standard Specifications, provided:

"105.1.1 The engineer will decide all questions which may arise as to the quality

and acceptability of materials furnished and work performed and as to the rate of progress of the work; all questions which may arise as to the interpretation of the plans and specifications; all questions as to the acceptable fulfillment of the contract on the part of the contractor; all questions of classification; the proper compensation for the performance or breach of the contract; all claims of any character whatsoever in connection with or growing out of the construction whether claimed under the contract, under force account, under quantum meruit, or otherwise; and his estimates and decisions shall be final, binding, and conclusive upon all parties to the contract."

Appellant correctly states that the courts of this state have upheld and applied contract provisions such as this. *United Construction Co. v. City of St. Louis*, supra; *Stiers Bros. Const. Co. v. Moore*, 158 S.W.2d 253, 257[2, 3] (Mo.App.1942); *Massman Const. Co. v. Lake Lotawana Ass'n*, 240 Mo.App. 469, 210 S.W.2d 398 (1948); *Public Water Supply District v. Maryland Casualty Company*, 478 S.W.2d 293 (Mo.1972).

■ The respondent's response, "If the law is as appellant says there never would have been a case involving a contract of the State Highway Commission before this Court or any other.", leaves something to be desired. Of course, respondent has no burden of showing that the trial court's ruling was correct. The rule relied upon does have application as will appear.

Inasmuch as the theory of recovery in case of a finding of breach of warranty in a case such as this permits the contractor to recover the extra expense made necessary by the conditions being other than as represented in the contract, the various items of respondent's claim must be analyzed in order to determine its right of recovery on such theory.

■ At the outset, it may be noted that, in practically all instances, the trial court accepted Wallace's testimony as to the work done and the quantities involved. In view of the rule set out above, such course was obviously error in view of the evidence of the engineer's measurements and decisions and Wallace's acknowledgment that the engineer did not act in bad faith.

■ The first item of respondent's claim was for $81,048.66 for the additional cost of removing the material encountered, compared to the cost of removal of the material had it been ledge rock. This item was based on a claimed additional cost of 0.53 cents per cubic yard for the 152,922 cubic yards of Class C Wallace claimed was excavated. Under the rule relied upon by appellant, the trial court erroneously accepted Wallace's measurement of Class C in view of the engineer's measurement, testified to in detail, that McMenamy excavated 146,-508 cubic yards of Class C.

This item is further challenged by appellant on the grounds that Wallace's testimony showed that the blasting of the rock on the job was done by a sub-contractor, American Mining Company. According to Wallace, he included their claim for extra compensation in respondent's claim. Wallace stated that American Mining had been paid for blasting 152,000 cubic yards of rock, although the contract with them (not offered in evidence) provided that American would be paid for the exact number of yards that the commission paid respondent. He stated that American had made no claim against respondent.

Arch Hall, an employee of American, testified that his company submitted a bid to respondent for drilling and blasting the rock on the job. The bid was 0.86 cents per cubic yard, based upon the assumption from the plans, of ledge rock. The material actually encountered was other than ledge rock and for reasons not necessary here to recount was more expensive to remove than ledge rock would have been. According to Hall, American's costs on the job amounted to $1.209 per cubic yard. He stated that he estimated a cost, based on the plans, of 0.67 cents per cubic yard. He stated that he expected McMenamy to pay his company the difference.

Inasmuch as, according to Hall, American bid 0.86 cents per cubic yard, there would be no basis for permitting recovery on the

difference between the estimated original cost and the final cost. At best, recovery would be based upon the difference between the amount received and final cost. However, a more fundamental question is presented as to respondent's right to recover on their claim. Whether or not American has a valid claim against respondent would depend upon the contract between those two parties. The contract was not offered in evidence. The claim of American against McMenamy is speculative and unliquidated. There has been no showing that McMenamy is liable to American and therefore there can be no basis for recovery by McMenamy against the commission on this element of the claim.

The trial court should have sustained the commission's motion to strike this paragraph of respondent's claim.

■ Respondent claimed and the trial court allowed respondent 0.38 cents per cubic yard of Class C or $58,110.36 based upon 152,922 cubic yards of Class C, for expense of loading and hauling such material in excess of what it would have cost had the material been ledge rock. Respondent's claim was based on the added cost of loading rock mixed with clay which presented problems in unloading the material and necessitated cleaning of equipment and dump beds frequently by hand.

This is the type of claim for which recovery may be had in a case such as this. Appellant contends, however, that there was no evidence to support the amount awarded respondent for this item. On direct examination, Wallace stated that the "company" had computed the extra cost of loading and hauling Class C. Wallace had made a similar statement regarding the cost of rock removal, adding that "we'll have a representative here that can give that cost." No representative appeared.

However, there was extensive cross-examination of Wallace on this item. Generally it showed that the item was based on extra labor for cleaning out dump beds and expense of additional equipment required to push the material into a bucket before it could be loaded. In addition extra cost was involved because the clay sticking to dump beds would reduce the usual 20-ton load a truck would carry to 15 tons. He said that a bulldozer was used to push the material into a bucket, but he did not know how many hours it was used. " * * * [W]e could probably get it for you." He said that time sheets showed the number of hours each day that a piece of equipment was used for a particular purpose and that the cost of operation of the machine is predetermined. The "cost department" took the figures as to time involved from the time sheets and Wallace applied the quantities to the cost. "I made the determination of how many yards we moved of this material, and based on the information furnished me by the auditing department, I arrived at a unit price of so much a yard for this Class 'C' for loading and hauling it."

Although Wallace did not state the amount per cubic yard upon which this claim was based, it amounted to $58,110.36 divided by 152,922 or 0.38 cents per cubic yard.

In view of the evidence adduced on cross-examination which was before the trial court without objection and was not the subject of a motion to strike, it cannot be said that there was no evidence upon which to base the computation of damages on this item.

In view of the previous determination that the measurement of the engineer is controlling, respondent is entitled to recover $55,673.04, computed on the basis of 0.38 cents per cubic yard for 146,508 cubic yards of Class C excavation.

■ The next item is for subgrade preparation and roadbed finishing in rock. The petition alleged that the plans indicated subgrade preparation and roadbed finishing in locations containing rock of 11,400 square yards. The petition alleged that estimates were prepared on the basis of those quantities "for which there was direct payment item in the proposal." It alleges that 80,600 square yards of such finishing in classified material were performed at an additional cost of $21,541.96.

This was not a "direct payment item in the proposal." Section 203.8, Standard Specifications, provided: "Payment for roadway and drainage excavation will be made at the contract unit bid price per cubic yard which price shall be full compensation for * * * preparation of subgrade; * * *, finishing of graded earth roadway, * * *."

Inasmuch as this was not a payment item under the contract, the cost of the item which was taken into consideration in submission of the bid was added to other matters making up payment items, such as Class C excavation, cut compaction, etc. Recovery for such item must be a part of the allowance heretofore made for added cost of Class C excavation. No allowance may be made for it as a separate item of recovery.

The same situation applies to the next item, $6,255 for an additional 13,900 square yards of variable back slope in percentage classification excavation. This was not a payment item and the conclusion reached on the subgrade preparation applies to this item.

■ The next item for which the trial court gave judgment for respondent was for the removal of 49,857 cubic yards of classified material below the "demarcation line" on the plans "and in an area which was indicated on the latter to be in an area where no further removal would be required." The court found that the material was unsatisfactory and had to be removed whereas the indicated material would not, by reason of which respondent sustained damages of $50,184.14.

Appellant attacks the trial court's finding that the indicated material would not have required removal. From the petition and Wallace's testimony it is clear that respondent did not rely upon the facts found by the trial court. The real basis of the complaint is that the Class A below the demarcation line was in classified material, i. e., intermixed with rock, and that it was thus more expensive to remove such material than it would have been to remove dirt alone. On direct examination, Wallace testified that if the material "had been a Class 'A' excavation cut, and no percentage classification involved, it would have been moved with scrapers rather than being moved with loaders and these big enddumps, and the difference in cost is approximately $1.02 a cubic yard." On cross-examination he stated:

"The as-built cost to load and haul all percentage materials, including everything below the demarcation line was a dollar and fifty-three and four-tenths cents. The estimated cost to load and haul Class 'A' with scrapers was 51 cents a cubic yard, leaving a difference of $1.02 that we claim it cost in addition to what we had already figured in there for that type of material, and that made a total of $50,584.14."

This was a proper item of recovery and there was evidence in the record to support the trial court's finding on it, ignoring the finding with respect to the non-necessity of removal of material below the demarcation line.

The next matters for review are claims for additional compensation, described in the petition as "for minor items." The claims on these items are not dependent upon the breach of warranty upon which the items previously considered were based.

■ The first item is a claim for 10,830 cubic yards of Class A excavation which it was claimed was "erroneously deducted." Recovery was sought and allowed at the unit price for this item or $7,689.30.

No good purpose would be served by lengthening this opinion by a detailed recitation of the evidence pro and con on this issue. This was a matter which the engineer was entitled to determine under the specification quoted above. The engineer did explain his computation of the item. There has been no showing of a gross mistake on his part implying bad faith. The trial court erred in refusing to accept the engineer's determination of this issue.

■ The next items relate to claims for Class A and Class C overbreak. The petition claimed and the court found that 29,-

141 cubic yards of Class A and 6,414 cubic yards of Class C overbreak had been erroneously omitted in payment on the final plan. Judgment was given at the unit price for $20,690.11 and $16,676 for the respective items.

These claims relate to removal of material within an area one foot below the bottom of base or designated limits of undergrading. According to Wallace, the specifications and Commission Standard Drawing 203.02 required the contractor to remove "one foot of that plastic material and percentage classification below the bottom of base." His testimony was that, since the specifications required the work to be done, it was done since the contractor adhered to the specifications. He made his estimate of quantities after the project was constructed by taking elevations at intervals using the pavement as a base line and recomputed the quantities on the basis of plans for the project as completed. He made the computation in every rock cut because the specifications required removal of one foot of classified material below the bottom of base.

The resident engineer, Carl E. Wulfers, testified that the commission paid for all measured overbreak up to 12 inches below the final grading template. He stated that one foot of material was not required to be taken out in the rock cuts and it was not in fact removed. According to him, the commission took cross sections in every cut as requested by the contractor's foreman and computed quantities on the basis of the data thus obtained.

Again, the contractor did not show that the engineer's computation of these items was the result of a gross mistake and the trial court erroneously substituted Wallace's computation for those of the engineer.

■ The next item was a claim for compaction of embankment, involving 28,294 yards of compaction of materials substituted for those removed as overbreak in the two items just considered. The claim was based upon the unit price for "Compacting Embankment" of 12 cents per cubic yard.

The trial court found that respondent was due $3,389.28 for 28,244 yards of compaction of embankment.

"Compacting Embankment" was a paid item under the contract. The engineer denied liability for the claim here on the basis of Standard Specifications, Section 203.8.2: "No direct payment will be made for backfilling overbreak areas, * * *." Wallace stated that the claim was based on Standard Specifications, Section 203.7.2.9: "All required compaction above the original ground line and all compacting of material placed in undergraded cut sections will be considered as Compacting Embankment."

Standard Specifications, Section 203.3.1, provides, in part:

"When payment of compaction is specified as a separate bid item of the contract, compaction * * * will be required in the following areas:

* * * * * *

"(b) All backfilled undergraded cuts, except as modified by Sec. 203.3.3. * * *"

Compaction and backfilling, it would appear from this, are separate procedures. Reliance upon provision against pay for backfilling would not preclude pay for compaction of the material involved. The engineer's reason for disallowance of this item is not supported by the contract. The allowance in favor of respondent for this item is affirmed.

■ The next item is a claim for compaction in cuts. This was a contract item. The bid estimate was for 184,616 cubic yards compacting in cut. Respondent's bid on this item and the contract price was 0.35 cents per cubic yard.

Section 203.3.7, Standard Specifications, provided, in part:

"Cut compaction shall be performed in areas designated by the engineer, after removal of the roadway excavation material to the required section. * * *."

Section 203.3.7.1 provided:

"The existing ground for the full width between roadway slopes under fills of less

than 18 inches in height shall be treated in a similar manner to insure having not less than 18 inches of material of the required density below a plane established by the top of the proposed grading section."

Section 203.7.2.10 provided:

"Compacting in Cuts will be the measured quantity of material compacted. The volume allowed for payment will be computed for actual areas compacted during construction, to the dimensions shown on the plans, and will include any required compaction of the original ground under shallow fills. For the purpose of computing pay volumes, the depth of compaction will be considered as extending 18 inches below a plane established by the top of the proposed grading section."

According to Wallace, respondent performed 166,155 cubic yards of cut compaction. Order records were issued by the engineer for 11,275 cubic yards of cut compaction and respondent was paid for that amount at the contract rate. The claim is for the difference of 154,880 cubic yards at the contract rate. The trial court found that the work had been performed and gave judgment for respondent for $54,208 on this item.

Wallace's testimony was that the specifications required cut compaction on all fills under three feet in height and that such work was done. He computed the quantity on that basis from the final plans and deducted the amount for which payment was received for work done on order records.

The commission's position was that payment for cut compaction should be made only in areas designated by the engineer and that respondent did receive payment for such work.

The contract provisions here involved could be more clearly written. However, the engineer's construction of this provision is not without basis and has not been shown to have been erroneous. The trial court erroneously allowed recovery for this item.

■ The next items involve excavation for a box culvert and placement of granular material around eight culverts. According to Wallace, in excavating for a box culvert at Station 481 + 85, the contractor encountered unsuitable material which he described as "unsuitable goo" from "an old hog wallow." He stated that undergrading was required throughout the 300' length of the tunnel. He did not give the volume of material involved but stated that respondent was due $2,802.60 for such work. Excavation for structures was a contract unit bid item, denominated Class 3 excavation, and McMenamy's bid for that item was $8.15 per cubic yard.

Commission engineers who observed the excavation stated that no unsuitable material was encountered. Rock was encountered and an order record authorized 7.3 cubic yards of rock excavation which was done and paid for. According to the commission engineers, the excavation was allowed to stand open following the discovery of the rock and an ensuing rain coupled with failure on the part of the contractor to maintain proper drainage in the excavation area caused the contractor's problem.

Respondent was paid for the excavation of 17,366 cubic yards of Class 3 structures excavation at the contract price of $8.15 per cubic yard. There has been no showing that the engineer's determination of this item was erroneous or in bad faith. The trial court erred in allowing recovery for this item.

■ The claim for granular backfill was based upon the claimed use of 750.9 tons of granular material at a cost of $2,560 as backfill around eight culverts. According to Wallace, he sought the approval of the engineer for the use of this material but the engineer declined to authorize it. Wallace stated that the request was based upon the unsuitable nature of the foundation material. Commission engineers attributed the problem to the contractor's failure to take proper steps to protect the excavation areas from the results of rain.

Section 206.6.3, Standard Specifications, provides: "Payment will not be made for removal or replacement of foundation material which became unsuitable because of

improper methods of construction by the contractor. * * * No payment will be made for any costs involved in replacing the volume below grade, except that the contractor will be reimbursed for the delivered material cost when a granular type material is specified by the engineer." The engineer, thus, was authorized to pass upon respondent's request. His refusal of the request has not been shown to have been erroneous or in bad faith. The trial court erred in allowing the claim for this item.

■ The petition sought recovery of $2,631 for work performed in clearing an outlet ditch at Station 654 + 95. The petition alleged that the work was necessitated by error in the plans in establishing the flow lines for drainage. The trial court found on the basis of Wallace's testimony that the commission had not acquired sufficient right of way to clear an escape route for the water and that silt collected in the ditch because the abutting privately owned land was of higher elevation than the right of way. The trial court found in favor of respondent on this item.

The trial court found that "it was admitted" that adequate right of way had not been acquired. It also found that the resident engineer admitted that he asked respondent to acquire the necessary additional right of way. Wulfers denied that he asked the contractor to obtain additional right of way. He did acknowledge that it was "1.23 feet higher at the right-of-way line than it was at the flow line of the new culvert."

The commission engineers attributed the problem at this location to siltation caused by erosion of roadway fills which the contractor failed to sod.

Although the finding that the engineer admitted that sufficient right of way had not been acquired is contrary to the evidence, the acknowledgment that the culvert outlet was 1.3′ below the right of way line would support a finding of inadequacy of plans as a cause of this problem. However, there was not one word of testimony as to the cost of correcting the problem. The trial court simply entered judgment for the amount stated in the petition. Respondent

had the burden of proof of that matter and in the absence of evidence, the judgment of the trial court must be set aside.

■ The petition claimed damages of $1,280 for reshaping the slope compacting subgrade and other work in a rest area. It was claimed that such work was made necessary by the commission's direction to delay work while a change of plans for the rest area involved was considered. Wallace testified that the area had been prepared for placing on the subgrade but that the contractor was requested to delay while engineers considered a change in the plans. While the contractor awaited the decision, considerable rain fell, resulting in erosion and silting of ditches. Work had to be redone for which the cost was $1,280.00.

According to Wulfers, a question arose about the back slope in the area. He asked Wallace to give him a price for laying back the back slope. Wallace did so but "it all fell through." He asked Wallace to "lay off" while the offer was being considered. When the deal fell through, the contractor came back in and finished the work in the area. He said that when he asked for the delay, the rough grading had been done on the back slopes and that the delay resulted in no additional work. He did state that there could have been erosion of the back slope caused by rain during the period of delay. The engineer's decision on this matter has not been shown to have been made in bad faith or erroneously.

■ The next item is a claim of $8,429 for expenses incurred by respondent in maintenance work on completed items when the project was opened for traffic. Wallace testified that, after the highway was opened to traffic, the contractor had to do general maintenance of the shoulders when traffic had practically demolished part of them, pick up trash, cans and considerable other work that had been completed prior to the opening of "through traffic (sic)." He stated that the cost was $8,429.78. The trial court gave judgment for respondent for $8,429 on this item.

The road was opened to traffic August 30, 1972. On October 6, 1972, commission engineers made a semi-final inspection and a report dated October 10, 1972 was made, calling for several "corrections" to be made by the contractor before acceptance for maintenance in accordance with Section 105.15 of the Standard Specifications. Wallace stated the report was "not worth the paper it was written on" because it did not describe the work that had been completed when the roadway opened for traffic and that all of the matters covered by the report had been completed before the road had been opened.

Wallace's testimony was not specific as to when the work for which relief was sought was done, but apparently it was undertaken as a result of the October 10 inspection report. At least, several items which Wallace said were done coincided with the requirements of the report. In that light, the trial court's finding on this issue that the project was finally completed in July 26, 1973 but not officially accepted until September, 1973, would appear to be irrelevant inasmuch as those times were not involved in the performance of the work for which payment was sought.

Section 104.5, Standard Specifications, permitted the commission to open a project such as this even though the shoulders and other items of work may not be completed.

Under the specifications, the contractor was not relieved of responsibility for all or any portion of the project until it had been accepted. There had been no acceptance of the area here involved at the time of the October 10, 1962 semi-final inspection report. Inasmuch as that report specified conditions of final acceptance, it can be assumed that there was no final acceptance until the conditions of acceptance had been satisfied. In any event, the contractor does not rely upon a final acceptance before the work here involved and the commission is not liable for this work.

■ The respondent sought recovery for $591 for 197 tons of Type 1 aggregate, contending that the commission computation that the material had been wasted was erroneous. It also sought $324 for 108 tons of Type 3 base, erroneously deducted. The trial court gave judgment for $500 on the two items combined, finding that "the major portion of the material was incorporated in the job." Commission engineers conceded that these materials were used on the job, but the amounts involved were deducted from payment for such materials because they were not used as authorized by commission plans. Under Section 105.3.1, Standard Specifications, if the engineer permits materials used not in conformity with plans and specifications to remain in place, he may make "an appropriate adjustment in the contract price for such work or materials * * *." Here the trial court made the adjustment, arriving at a figure of $500.00. This was a matter for the engineer and his decision has not been shown to have been erroneous or in bad faith. This item of the judgment should be reversed.

■ The next matter relates to the retention by the commission of $60,000 as liquidated damages for delay in completion of the project. The commission did remit $1,500 of this amount, leaving in issue $58,500, based on damage at the rate of $500 per day. The trial court entered judgment for respondent on this claim and ordered the return of $58,500 to respondent.

The petition charged that the delay in completion of the project was due to "the back slope in rock cuts" and delays occasioned by redesign of footings for bridges on the project. The trial court found that the bridge redesign and substantial overrun in rock excused the delay in completing the contract by the contract completion date.

The contract called for completion of the project in 250 working days. The commission began to assess liquidated damages June 1, 1972 and did so through July 15, 1973.

Respondent offered no testimony as to the effect of "the back slope in rock cuts" upon the time of completion of the project. The trial court's finding in that regard is without evidentiary support.

▪ Wallace did testify at length concerning delays caused by redesign of footings on two bridges on the project. On one of the twin bridges on bridge No. 283, he testified to delays occasioned by footing redesign totalling 141 days. On the other bridge at the location, he testified to similar delays totalling 45 days. On Bridge FF, he testified to delays totalling 239 days. Work began on Bridge FF on July 9, 1971 and it was completed October 29, 1971. On bridge No. 283, the delays complained of all related to footing designs for interior bents. Those structures were completed August 25, 1970. The end bents were completed in December, 1970.

Cross-examination revealed that Wallace's testimony as to delays was based upon the difference between the time that the situation requiring redesign was encountered and the time that the written order record for the change was received. However, in a number of instances the redesign had been received earlier and the work begun on oral authority from the engineer.

Section 206.2, Standard Specifications, provided that depth of excavation for footings for structures shown on plans was approximate only and that the engineer might order such changes as were necessary to provide a satisfactory foundation.

Wallace testified that the delays in receiving the redesign instruction delayed completion of the contract. "Well, any time that you have your equipment tied up and sitting idle, you're delayed in completing the contract." Orders for delivery of structural steel had to be put off, but the supplier eventually had to deliver them before the contractor was ready for them and they had to be stored on the ground and picked up and installed from there, rather than from trucks.

Wallace testified that the contractor was not allowed any time on the contract by reason of the delays in the bridge footing redesigns. He stated that he did not know why no additional time was allowed. He did not testify that a request for allowance of additional time was made in accordance with Section 108.6.2, Standard Specifications, requiring the contractor, in the event that he claims an extension of time because he is unable to work for reasons beyond his control, to make written claim therefor within 30 days after the claimed cause for delay has ceased to exist. The claim before the commission recited that repeated requests, both verbal and written, for additional time due to the delay caused by the redesigns were "refused by the District."

Section 105.1.1, Standard Specifications, gives the engineer authority to decide questions " * * * as to the rate of progress of the work; * * *." Extension of the contract time because of the problems here involved was for his determination. His refusal to extend the time has not been shown to have been so erroneous as to indicate bad faith. The trial court should not have rejected his decision in returning the liquidated damages to respondent.

*Gillioz v. Mo. State Hwy. Comm.*, 350 Mo. 1077, 169 S.W.2d 901 (1943), cited by the trial court in support of its conclusion on this issue, did not consider the effect of the engineer's determination on the delay involved in a liquidated damage claim. In that case, the bridge involved was the only item in the project. Delay with respect to it necessarily would delay completion of the contract. The bridges involved in this case were relatively minor parts of the entire project.

▪ The court allowed respondent $22,000 for reimbursement for rental costs for special equipment kept on the job by reason of delays in providing bridge footing redesigns. This item was not a part of respondent's claim before the commission and therefore was not properly before the court. Respondent's contention that such defense was waived because not asserted in appellant's original answer is without merit. The defense was asserted in the amended answer, the original pleading had no further effect, except insofar as it might have contained admissions binding upon appellant. Whether or not the defense was asserted must be determined on the pleading upon which the case was tried.

Respondent further asserts that a letter from the chief engineer to respondent's counsel, dated March 7, 1975, rejecting respondent's claim, in effect asserted that it was not necessary for respondent to present its claim to the commission. The letter does advise the attorney that failure to appear before the commission to present the claim would not "jeopardize your position regarding the claim." This is not a general waiver of the requirement that the claim include the items for which adjustment is sought.

The judgment allowing respondent interest at the rate of 6% from July 24, 1974, is set aside. Respondent is entitled to interest at the rate of 6% on the items for which it is entitled to recover from the date of the filing of claim with the commission, November 18, 1974. *Denton Const. Co. v. Missouri State Hwy. Comm.*, supra, 454 S.W.2d 59–60 [16–18].

The judgment of the trial court on Count I of the petition should be set aside and a new judgment entered awarding damages to respondent of $55,673.04 under Paragraph 5 of Count I of the petition; $50,585.14 under Paragraph 8 of Count I; $3,389.28 under Paragraph 9(d) of Count I of the petition; together with interest on said items from November 18, 1974. On all other items for which recovery was sought, judgment shall be entered in favor of appellant.

No issue has been made as to the judgment on Count II and it is affirmed.

The cause will be remanded for entry of a new judgment.

Judgment set aside and cause remanded for entry of new judgment as to Count I. Judgment on Count II affirmed.

All concur.